489 So.2d 1250 (1986)
STATE of Louisiana
v.
Glenn FORD.
No. 85-KA-1039.
Supreme Court of Louisiana.
March 31, 1986.
Rehearing Denied May 30, 1986.
*1252 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul J. Carmouche, Dist. Atty., Carey Schimpf, A. Marty Stroud and John Broadwell, Asst. Dist. Attys., for plaintiff-appellee.
William Paul Lawrence, Kim Lavigne, Mayer, Smith & Roberts, Donald Minor, Office of Public Defender, and Richard Hiller, Shreveport, for defendant-appellant.
DIXON, Chief Justice.
Glenn Ford was convicted and condemned to death for the first degree murder of Isadore Rozeman. He appeals from both the conviction and the sentence, assigning forty-eight points of error to the proceedings below.[1] We affirm both conviction and sentence.
On November 5, 1983 Dr. A.R. Ebrahim called on Mr. Rozeman at the latter's home and antique watch repair shop. Finding the front door ajar and the shop ransacked, and unable to find Mr. Rozeman, Dr. Ebrahim went next door and called police.
Officer Skaggs arrived within minutes to discover Mr. Rozeman lying behind a display cabinet, lifeless and bleeding from a .38 caliber gunshot wound to the head. Next to the body lay a partially filled duffel *1253 bag, pierced by the fatal bullet, with powder burns on one side and blood on the other. A paper grocery bag, crumpled as if used as a glove, was also found at the scene. The shop display cases had been emptied of watches and other jewelry; Mr. Rozeman's pockets were turned inside-out. There appeared to have been no struggle.
The police questioned Dr. Ebrahim and immediately canvassed the neighborhood. Dr. Ebrahim had spoken to Mr. Rozeman, he said, at approximately 2:30 p.m. and had arranged to meet him later that afternoon. Heidi and Spring James, two young neighbors of Mr. Rozeman, had seen Mr. Rozeman's yardman in an alley adjacent to his property at approximately noon. Another neighbor placed the yardman in the vicinity at between 1:30 and 2:00 p.m. A third neighbor identified Mr. Rozeman's yardman as Glenn Ford, and the police put out word he was wanted for questioning.
Ford appeared at the police station accompanied by his father at 2:00 o'clock the following morning, and voluntarily recounted his day's events. The night of the 4th he stayed with Chris Johnson and Rickey Deming at Johnson's apartment. He arose the morning of the murder and went with Johnson to catch a bus and do some shopping. When the bus had not arrived by 11:00 a.m. as scheduled, they returned toward home. Ford saw an acquaintance, whom he could or would identify only as "O.B.," and with him proceeded to Mr. Rozeman's neighborhood. Together they went to the Keep Happy Grocery, then to Mama Mia's Pizzeria, where a beer salesman gave them each a beer. Ford next went alone to speak with Mr. Rozeman, at about 1:20 p.m., seeking either work or an advance in pay. Advised that Mr. Rozeman had nothing for him to do and could not extend him an advance, Ford left Rozeman's shop. He urinated in the alley, rejoined his companion briefly, and then caught a ride with Clarence Pouncey and Alvin White to his girl friend's house. Finding no one at home, Ford proceeded to a nearby housing project, where he watched a dice game. He returned to his own apartment at about 3:30 p.m. and remained there for the rest of the evening.
In response to police questioning, Ford denied owning a gun or having recently fired one. While at the station Ford consented to be photographed and submitted to fingerprinting and a gunshot residue test. He also consented to a search of his apartment, which turned up nothing. He and his father were allowed to leave at 5:00 a.m. and went out to breakfast.
The police proceeded to verify the particulars of Ford's statement. They spoke with Deming, who confirmed that Ford had spent the night at Johnson's apartment. From him the police also learned that Ford had discussed purchasing a handgun. They spoke with Pouncey and White who acknowledged giving Ford a ride. From them the police also learned that Ford had attempted to sell a handgun that afternoon. Ford was sought out for further questioning.
Ford agreed to give a second statement, in which he again maintained he did not own a gun, but admitted to trying to sell one on behalf of "O.B." Police again allowed him to leave.
Ford was arrested after pawn shop receipts revealed he had sold jewelry, similar to that taken from Mr. Rozeman's shop, shortly after the murder. In his third statement given police, on November 8th, he said he received these items from "O.B." and pawned them at his request. The following day police searched Ford's apartment a second time. On this occasion they found demitasse spoons, a cross, gold chains, a pill box and shirt studs, all similar to items customarily sold by Mr. Rozeman.
On November 11th Ford gave a fourth statement, implicating Henry and Jake Robinson in the murder. Henry Robinson was apprehended in California; a search of his luggage turned up a shirt stud matching those found in Ford's room. In his fifth statement, given on November 13th, Ford identified Henry "Nirobi" Robinson as "O.B." He further stated that the Robinson brothers had told him of their plan to rob Mr. Rozeman and asked him to join them, but that he declined to do so. He indicated he was fearful of the Robinsons *1254 and the police agreed not to use this statement in court.
In January of 1984 Donnie Thomas, a co-defendant's brother-in-law and Ford's cellmate, related to police that Ford had discussed with him the details of the robbery and murder. According to him, Ford was able to gain access to Mr. Rozeman's shop because he was recognized by his employer. All three men participated in the robbery. Ford shot and killed Mr. Rozeman. In February police interviewed Marvella Brown, Jake Robinson's girl friend. She stated that Ford arrived at her apartment around noon the day of the offense, and asked the Robinsons, "Is you still going?" The three left, she said, returning around 3:00 p.m. with a sack containing jewelry. Ford carried a .22 pistol, and Jake Robinson had a .38.
Ford was charged with first degree murder on February 9, 1984. An indictment was returned against him and the Robinson brothers on March 21, 1984. In its bill of particulars, filed April 25, 1984, the state averred that Ford "held the gun to Rozeman's head and pulled the trigger and/or was a principal thereto." The time of the murder was said to be "November 5, 1983 at approximately 2:00-3:00 p.m." The state served Ford with a request for discovery and notice of intent to present an alibi defense. In this document the state placed the time of the murder at "between 2:00 p.m. and 4:00 p.m." Ford advised the state he would present evidence that he was not in Mr. Rozeman's neighborhood during those times.
Trial commenced on November 26, 1984. The defense was alibi; the defendant did not testify. His first two statements were introduced into evidence by the prosecution, and he attempted thereafter to introduce the third, in which he had explained to police that he pawned the jewelry for "O.B." The state objected, and the evidence was not allowed. The jury was charged on December 5, 1984 and returned their unanimous verdict on the guilt phase in just under three hours.
The penalty phase was conducted on December 6, 1984. The prosecution called two witnesses. It argued that the murder was committed during an armed robbery, that it was committed in an especially cruel, heinous or atrocious manner, and that the victim was an eyewitness to a crime committed by the defendant. See C.Cr.P. 905.4. The defense called defendant's father and several acquaintances, and Ford spoke on his own behalf. The jury deliberated for two and one-half hours, returned its recommendation for the death sentence, and was excused.
Sufficiency of the Evidence
Defendant's conviction cannot be upheld unless viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime of first degree murder beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, reh. denied 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). Because the state's case against Ford is based upon circumstantial evidence, however, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." R.S. 15:438; State v. Martin, 458 So.2d 454, 462 (La.1984); and see State v. Chism, 436 So.2d 464, 470 (La. 1983). The defense has not reurged the insufficiency of the evidence as grounds for reversal before this court. We feel, however, that serious questions were raised by defendant's motion for new trial, and are constrained to review the evidence before turning to defendant's assignments of error. See State v. Raymo, 419 So.2d 858, 861 (La.1982).
The prosecution first called Dr. Ebrahim to the stand. He testified he telephoned Mr. Rozeman between noon and 1:00 p.m. He further explained that Mr. Rozeman, who suffered from poor eyesight and feared for his safety, was extremely careful in admitting people to his shop. The front door was always locked and even he would call ahead to announce his arrival. Mr. Rozeman would identify his visitor through a "peep-hole" in the door, or by voice, before allowing entry.
*1255 Mrs. Alice Pace followed Dr. Ebrahim to the witness stand. She testified she and Mr. Rozeman were partners in business and was able to identify several items pawned by the defendant as having been taken from the shop. She and Mr. Rozeman's brother confirmed Mr. Rozeman's caution in admitting visitors to the shop, although Mr. Rozeman's brother admitted on cross-examination that he sometimes found the front door unlocked.
A Mr. Brookins testified he left a watch to be repaired by Mr. Rozeman on November 4th. He stated that he appeared at Mr. Rozeman's shop in military uniform, unannounced, and that Mr. Rozeman peered through the peep-hole before allowing him inside. On cross-examination he stated he could not be certain there was a peep-hole in the door. He identified a watch pawned by the defendant on the 5th as the watch he left with Mr. Rozeman on the 4th.
Officer Skaggs testified he was on patrol the afternoon of November 5th, and that he received a call from the police dispatcher at about 3:20 p.m. He arrived on the scene at 3:24 p.m., found Mr. Rozeman, and noticed "a slight seepage" of blood from the wound. Thinking that Mr. Rozeman might still be alive, he called for paramedical assistance. He also noted that blood on the floor had begun to coagulate.
Officer Skaggs further testified that he interviewed Dr. Ebrahim shortly after arriving on the scene. Questioned as to the discrepancy between Dr. Ebrahim's initial statement that he called Mr. Rozeman at 2:30 p.m., and the doctor's testimony at trial, in which he placed the call some two hours earlier, Officer Skaggs stated to the jury:
"There is always the possibility of error in thisor misunderstanding, due to the fact that he did have a heavy accent. Like I said, in reviewing my report, I noticed the first thing that I had his initials down instead of his full first name. I also did not understand him when he told me what kind of a doctor he was. And when I had told him what the situation was with Mr. Rozeman, for one, he was upset a little bit, and two, he [had] a heavy accent, which made it hard to understand him."
Louis Traylor, an emergency medical technician, testified he responded immediately to Officer Skagg's call for assistance. Arriving at 3:28 p.m., he entered the shop to examine the victim. He found no pulse. It was further his testimony that the body was cold to the touch and "was beginning to stiffen up."
Sergeants Kemper and Lockwood were among the next to arrive. Kemper videotaped the scene. He testified as to the discovery of the grocery sack, and offered his conclusion that the robber had used it to avoid leaving fingerprints. Lockwood photographed and diagramed the scene, and then began an unsuccessful search for fingerprints. He testified that a partial print was taken from the inside of the grocery bag, and that that print was of a "whorl type pattern." He explained to the jury that the whorl pattern is characteristic of 35% of all fingerprints, including Glenn Ford's fingerprints, and that neither Jake nor Henry Robinson had fingerprints of this pattern. He would not state that Ford left the fingerprint in the grocery bag.
Detectives Mitchell and Datcher reached Mr. Rozeman's shop together at about 4:30 p.m. and began to question neighbors. Detective Mitchell testified he began to look for Ford based on information so obtained.
Several neighbors also testified. Spring James told the jury she saw a man running behind Mr. Rozeman's shop sometime after noon on the day of the offense. She was unable to identify the defendant in court, although it was established she had identified him in a photographic line-up shortly after Mr. Rozeman was killed. Heidi James testified she had seen the defendant walking in the alley before noon. Chandra Nash testified she had seen the defendant in the alley between 1:30 and 2:00 p.m. The beer salesman placed the defendant near Mr. Rozeman's house at about 1:00 p.m.
Dr. Robert E. Braswell, parish coroner at the time of the murder, recounted to the jury that he arrived at Mr. Rozeman's shop *1256 at between 4:30 and 5:00 p.m., when he examined the body. He found it warm to the touch, and observed it had not yet begun to stiffen. From his examination he concluded that Mr. Rozeman had died "probably within a four hour time frame, give or take an hour, or so." In response to defense questioning, he agreed there was "[n]othing about the body to say that he died earlier than 2:30, or later."
Dr. George McCormick, parish coroner at the time of trial and self-styled "public witness," reconstructed the murder from his examination of Sergeant Lockwood's photographs, Sergeant Kemper's videotape, Dr. Braswell's autopsy report, and his own after-the-fact visit to Mr. Rozeman's shop. It was his expert opinion, and he so testified, that the duffel bag was placed over Mr. Rozeman's head to muffle the gunshot and to shield the murderer from blood spatter. He was further of the opinion that Mr. Rozeman was forced by the killer to lie prone on the floor, and that the wound left virtually no chance of survival. From the location of the body between the display cabinet and the wall, he deduced that the killer had been left handed, and was positioned at Mr. Rozeman's head when the shot was fired. He estimated that Mr. Rozeman had been killed "at least two hours prior to the time he was found," and thought the time of death not inconsistent with the time of Ford's admitted presence at the scene.
Mr. Pat Wojtkiewicz, an employee of the North Louisiana Crime Lab, explained his analysis of the gunshot residue test performed on the defendant and the significance of the results obtained. He found one particle unique to gunshot residue, and four particles characteristic of gunshot residue, taken from Ford's left hand.[2] Three characteristic particles were taken from Ford's right hand. He noted that residue particles are extremely minute and easily transferred from one person to another through casual contact. He steadfastly declined to speculate whether Ford had actually fired a gun, explaining to the jury that it was possible Ford had been in the vicinity of a gun fired by someone else, or that he had handled a gun which had recently been fired, or that he had picked up the particles by coming into contact with someone who had fired a gun.
Marvella Brown was called as a witness for both the state and the defense, and testified at length. On direct examination by the prosecution she stated that Ford arrived at her apartment between 11:00 a.m. and noon on the day of the murder. Jake and Henry Robinson were already there. The three left, five minutes apart, between twenty and forty minutes later. The Robinsons returned in two or three hours, and Ford arrived a few minutes later carrying a grocery bag with something in it. She learned of the Rozeman murder on the six o'clock news. "Between 8:00or either 7:00" that evening, she noticed Jake Robinson had a .22 and Ford a .38. Later that night Jake Robinson let her choose from among some old pieces of jewelry. She decided upon several rings, which disappeared from her night stand by morning.
On cross-examination Brown was questioned about numerous inconsistencies contained in her prior statements to police. In a statement given February 9, 1984, for instance, she said that Jake Robinson was at her apartment when Glenn Ford arrived at 11:00 a.m., followed some time later by Henry Robinson and a fourth individual. The four left around noon. The defendant and the Robinson brothers returned in two or three hours and the fourth person returned twenty minutes later. All but Jake left within minutes and he soon followed. She saw nothing more of any of them until Jake returned around midnight.
The following colloquy from the same statement was read at trial:
"DETECTIVE: ... when they came back with the sack, did you see anyone with any guns?

*1257 MS. BROWN: Yes, I did. `Long Hair' [Glenn Ford] with a gun. I don't remember whether it's a .22 or not, but that's I (inaudibly) .22. Jake had a gun, sort of like yours.
DETECTIVE: Okay. So, the gun that `Long Hair' had, was it a big gun, or a little gun?
MS. BROWN: It's small ...
DETECTIVE: A short gun. Okay, And the gun that Jake had, you said it looked like the gun that I'm carrying? A police gun that we carry?
MS. BROWN: Yes.
DETECTIVE: And it's big like that?
MS. BROWN: Yes, but it's a different handle on it.
DETECTIVE: It had a different handle to it? Did you see Henry with a gun?
MS. BROWN: No.
DETECTIVE: How long did you keep the rings before Jake got them back?
MS. BROWN: The rings that he gave me?
DETECTIVE: Yes.
MS. BROWN: I think it was about two weeks, or more."
Brown insisted before the jury that the detective had fabricated her responses; however, when called as a direct witness for the defense, Brown stated that she suffered from a gunshot wound to the head, and that a bullet remaining in her skull caused her difficulty with "hearing," "thinking," and "nerves." Finally, when asked if she had lied to the court, she responded, "I did lie to the Court.... I lied about all of it."
Evidence of Ford's conversation with his cellmate was not presented to the jury.
The evidence against Ford is not overwhelming. Nonetheless, viewed in the light most favorable to the state, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. The evidence tends to prove that Mr. Rozeman was cautious in admitting strangers to his shop, that he knew the defendant, and that the defendant was in the immediate vicinity of the crime from 11:15 a.m. until between 1:30 and 2:00 p.m. It is not disputed that Ford was at Mr. Rozeman's residence at 1:20 p.m. The evidence also tends to prove that Mr. Rozeman died between 11:30 a.m. and 1:30 p.m., that his killer was left-handed, and that Glenn Ford was left-handed. Defendant spoke of purchasing a handgun the morning before the murder and attempted to sell one later in the afternoon.
In addition, a grocery bag found at the scene of the crime bore a fingerprint which could have belonged to Ford, but could not have belonged to Jake or Henry Robinson, assuming their involvement. A gunshot residue test of defendant's hands returned positive, if not conclusive. Jewelry from the robbery was pawned by the defendant at 5:30 p.m. This evidence tends to prove defendant's participation in the robbery and the murder.
Assuming these facts to be proved, we conclude the evidence negates the alibi defense offered to the jury. No other reasonable hypothesis of defendant's innocence has been advanced; the due process concerns of Jackson v. Virginia, supra, are satisfied.
Assignment of Error No. 1
Ford argues the trial judge erred in denying his pretrial motion to suppress his two statements of November 6, 1984, and all evidence, including fingerprints, the gunshot residue test results, and jewelry seized in his apartment, to which those statements ultimately led.
At the hearing on the motion, Detective Pitman testified he had been unable to locate the defendant on the day of the offense. He therefore called Mr. John Ford, defendant's father, and asked to speak to him about his son. John Ford arrived at the police station at about 1:00 a.m., and agreed to find the defendant. The two returned in about an hour.
Detective Pitman stated that defendant was advised of his rights and executed a written waiver. He then gave an oral statement lasting some thirty to forty-five minutes. Similar waivers were executed allowing the fingerprinting, the search, and *1258 the gunshot residue tests. The search was conducted in the presence of defendant's father. At 4:04 a.m. defendant was again advised of his rights, and gave a recorded statement lasting approximately twenty minutes. He was described by Detective Pitman as cooperative throughout the morning.
Concerning the second interview, Detective Pitman testified he contacted defendant at about 1:30 the next afternoon and asked him to return to the station. Defendant waived his rights in writing at 1:51 p.m. and gave a second statement.
The defendant's father testified the police called him between 11:00 p.m. and midnight. When he arrived he was advised to locate his son, whom the police would otherwise treat "more roughly." He left to find the defendant, and the two returned together at about 1:00 a.m. He testified his son came willingly and that neither was mistreated by police.
The defendant also testified at the hearing. He acknowledged going to the station voluntarily on each occasion in question. He conceded he had no objection to the fingerprinting, the gunshot residue testing and the search of his room, and that he had not been abused, coerced or threatened. As to the early morning statement he claimed, however, that he arrived at the station at 1:00 a.m. and was not read his rights until after he had submitted to the tests and recounted his story several times. See State v. Menne, 380 So.2d 14 (La. 1980), cert. denied 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). He could not say whether he had been advised of his rights that afternoon.
In denying the motion the trial judge stated:
"Well, I think that your client and his father are mistaken and/or not telling the truth. I think he was given his Miranda rights as soon as he hit the station. He knew he did not have to come and I understand your argument, but it all rises and falls on whether or not he is telling the truth. And I do not believe he is.
I think he was given his Miranda rights and he had these cards read to him. They are signed, dated and initialed by the detectives all the way through the entire process. I think it is just exactly as the detectives said.
Your client was very, very cooperative from the word go."
We agree that the question must be resolved on the credibility of the witnesses. Absent an abuse of the trial judge's discretion evident on the transcript, the call was his to make. We find no merit to this assignment.
Assignment of Error No. 2
During voir dire examination defense counsel sought to explain that Ford could be guilty of receiving stolen property, and yet be innocent of murder, in an attempt to excuse peremptorily those jurors who were predisposed to convict by inference. The prosecution objected to committing the jurors on the evidence in advance of trial, and the objection was sustained. Defendant claims this ruling denied his constitutional rights to a full and complete voir dire and to exercise peremptory challenges intelligently. La. Const. Art. I, § 17.
The scope of voir dire examination is within the sound discretion of the trial judge. C.Cr.P. 786. To determine whether that discretion has been exceeded, the reviewing court must examine the record of the voir dire proceedings as a whole. State v. Williams, 457 So.2d 610 (La.1984).
Once the objection had been in part withdrawn and questioning resumed, defense counsel was allowed to state:
"Ladies and gentlemen ... we believe that evidence will be offered showing that Mr. Ford, the defendant, pawned some items that had been taken from the robbery. I would like to find out if you understand the difference between the crime of receiving stolen goods and the crime of robbery or murder."
Of one prospective juror he asked:
"... do you understand what I'm saying? That the man might be charged or considered guilty of having in his possession *1259 items that were stolen from the scene of a murder. That is not the same thing as guilt of having participated in the robbery and the murder itself. Do you understand what I'm saying?
. . . . .
Can you see a distinction between that and having actually participated in the robbery-murder? Is that making any sense to you?"
Of the next he asked:
"Now, how about you, would you assume automatically the man's guilty of the crime of murder, based upon his possible guilt of a lesser offense, receiving stolen goods?"
And to the succeeding group of prospective jurors he stated:
"You heard me say, also, that Mr. Ford is going to be shown to have pawned some items that are believed to have been stolen in connection with this robbery-homicide. And I explained to this group of jurors that there is a distinction between guilt for receiving items that have been stolen, from whomever might have committed the crime, and guilt for having committed the crime itself. Do any of you have any question about that? Does that pose a particular problem for you?"
Thereafter, defense counsel asked similar questions of each potential juror. The state and the trial judge asked similar questions. Defendant's rights to voir dire and to peremptory challenges were not infringed.
Assignments of Error Nos. 3, 6, 7, 8, 9, 10
Six of forty veniremen were excused for cause because they expressed inalterable opposition to capital punishment. Relying upon Grigsby v. Mabry, 758 F.2d 226 (8th Cir.), cert. granted sub nom Lockhart v. McCree, ___U.S. ___, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985), defendant contends that exclusion of these and like jurors constitutes a systematic exclusion of an identifiable segment of the population from serving in capital cases, resulting in "conviction-prone" juries, and denying him the right to a jury selected from a fair cross section of his community. These contentions are foreclosed by State v. Ward, 483 So.2d 578 (La.1986); State v. Lowenfield, 85-KA-0255 (La., Dec. 2, 1985); and State v. Jones, 474 So.2d 919 (La.1985).
Assignment of Error No. 4
The defendant claims it was error not to excuse for cause one prospective juror based upon that person's "constant and favorable" association with policemen in the community. See C.Cr.P. 401, 797. He refers to testimony taken at the voir dire examination in which the potential juror admitted knowing "too many [officers] to name all of them."
Previous associations with law enforcement agencies or personnel standing alone does not disqualify a potential juror, but requires careful scrutiny by the trial judge and the exercise of informed discretion. State v. Jones, supra at 926. This court will not disturb the trial judge's ruling if a close review of the record as a whole reveals no abuse of that discretion. Our review of the record discloses no error.
The juror indicated he understood the limited purpose of the indictment, that he understood the heavy burden on the state to establish guilt beyond a reasonable doubt, that he understood the elements of the crime of first degree murder and could distinguish among responsive verdicts, that he understood the distinction between direct and circumstantial evidence, and that he understood the circumstantial evidence rule. He stated he was not acquainted with any potential witness. He did know a co-defendant, however. Finally, he testified he could give both sides a fair trial, and that he would not credit testimony of police officers over that of other witnesses. On the other hand, nothing in this juror's testimony provides a basis from which bias, prejudice, or inability to render impartial judgment might be inferred. On the basis of this record we cannot say the trial judge abused his discretion in declining to excuse for cause.
Assignment of Error No. 5
The defendant contends the trial judge erred in refusing to exclude the testimony *1260 of Spring and Heidi James, among other witnesses, whose testimony contradicted defendant's alibi defense, for the state's failure to comply with the notice requirements of C.Cr.P. 727 in timely fashion. Notice was not filed until the second day of voir dire; prior to that time, the defense contended, it had only the state's subpoena list containing over sixty names, and had no indication as to which witnesses would place the defendant at the scene. The prosecution countered that each witness had been discussed with defense counsel.
The trial judge ordered the state to make the witnesses available for interview by the defense and the witnesses were provided that afternoon. Opening statements were made the following morning.
The purpose of the discovery rules is to eliminate unwarranted prejudice from surprise testimony at trial. State v. Toomer, 395 So.2d 1320, 1329 (La.1981). There is no evidence to suggest that the defense was prejudiced by the state's untimely disclosure. The witnesses were produced and interviewed prior to trial, eliminating any potential for surprise; several corroborated aspects of defendant's alibi before the jury. On this record no error is shown in the trial court's refusal to exclude the testimony.
Assignment of Error No. 11
The defendant contends it was error to show the jury several "gruesome" photographs depicting "an elderly man's face lying in his own blood which had been spilled by a bullet that entered the back of his head and exited through an eye."
The admission of such photographs is allowed unless it is clear the prejudical effect of the photographs outweighs their probative value. State v. Ward, supra at 586; State v. Kirkpatrick, 443 So.2d 546, 554 (La.1983), cert. denied 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Celestine, 443 So.2d 1091, 1095 n. 1 (La. 1983), cert. denied ___ U.S. ___, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984). In general, photographs which illustrate any fact, shed light on any fact or issue, or are relevant to describe the person, place or thing depicted are admissible. State v. Kirkpatrick, supra.
The trial judge thought the photographs in question relevant to the issue of intent and we agree. He stated:
"These photographs are relevant. One issue in the case is specific criminal intent. How a man suffered a wound, and where it was and what it looks like may have something to do in the minds of the jury. It shows the bullet, the location of the bullet, also the location of the man. In my opinion, it's relevant."
The photographs also serve to prove the identity of the victim and, in addition to the location of the victim's body, they show the positioning of his body. The precise location of the body underlies the state's theory that the killer was left-handed. The positioning of the victim's arm was suggested to explain why a left-handed murderer would not have been spattered with blood. And while they are not pleasant, we cannot say these photographs are "so gruesome as to overwhelm reason," see State v. Brown, 414 So.2d 689, 698 (La.1982), or that whatever prejudicial effect they might have had on the jury outweighed their evidentiary value.
The defendant claims his offer to stipulate to the contents of the photographs rendered their introduction into evidence unnecessary, or at least lessened their probative value such that they should not have gone before the jury. State v. Gilmore, 332 So.2d 789 (La.1976). We note that defendant offered to stipulate only to the identity of the victim and to the location of the bullet. We do not think such a stipulation lessens the probative value of these photographs to any significant extent. State v. Tonubbee, 420 So.2d 126, 133 (La.1982), cert. denied 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342, reh. denied 462 U.S. 1146, 103 S.Ct. 3132, 77 L.Ed.2d 1381 (1983). The photographs were properly admitted.
Assignment of Error No. 12
Defendant contends the trial court erred in denying his motion for a new trial *1261 after the state presented evidence at variance with information provided in its bill of particulars. He grounds this assignment in the Sixth Amendment to the United States Constitution, Article I, § 13 of the Louisiana Constitution and Article 727 of the Louisiana Code of Criminal Procedure.
Prior to trial the state variously alleged the crime to have been committed "at approximately 2:00-3:00 p.m.," and "between 2:00 p.m. and 4:00 p.m." This was based, apparently, on Dr. Ebrahim's statement at the scene that he had spoken with the victim as recently as 2:30 p.m., and subsequent statements by Dr. Ebrahim placing the call at between 2:45 and 3:00 p.m.
Defendant contends he marshaled his alibi evidence with the assumption that the evidence submitted at trial would conform to these estimates. In his opening statement before the jury, defendant's counsel outlined Ford's activities on the day of the murder. He indeed conceded that Ford had been to see Mr. Rozeman at approximately 1:20 p.m. to ask for work. In anticipation of Dr. Ebrahim's testimony, however, he stressed that Mr. Rozeman was still alive an hour later when, the jury was told, Ford was watching a dice game on the other side of town.
Instead, Dr. Ebrahim told the jury he made the call between noon and 1:00 p.m., prior to defendant's admitted visit. The defendant argues that this unexpected testimony, in conjunction with the opinions of Drs. Braswell and McCormick later elicited by the prosecution, "locked [him] into the position of having to call witnesses in support of the defendant's alibi who would simply help make the State's case against him."
The defendant declined a continuance, believing the damage could not be cured. Noting that the bill of particulars merely approximated the time, that the defendant had in any event accounted for his activities from 10:15 a.m. to 3:35 p.m. on the day of the murder, and that he was "prepared to substantiate [his] schedule," the trial judge denied the new trial and an alternate motion to exclude any evidence showing the crime to have been committed prior to 2:00 p.m. We do not think the defendant was prejudiced by this ruling.
First, Ford was able to impeach Dr. Ebrahim through use of his prior statements. Second, as the trial judge recognized, the critical period for the defendant fell between 11:00 a.m. and 3:30 p.m., and his alibi for both those times was firm. He came to trial ready to rely on "O.B." and Raymond Franklin to account for his time in between. "O.B." never testified; Franklin, who was to place Ford at the dice game, could not remember when he saw him there. Finally, the defendant had the opportunity to interview all witnesses, including the two doctors, whose testimony we do not suppose was affected by Dr. Ebrahim's emendation. The motions for a mistrial and to exclude evidence inconsistent with the bill of particulars were correctly denied.
Assignment of Error No. 13
Defendant contends the trial court erred in allowing Officer Skaggs to testify that the victim's blood had begun to coagulate when he arrived upon the scene. In response to defendant's objection, the trial judge stated:
"If he is asked the question whether or not the bloodof what its condition with reference to coagulation, if he knows, I think a layman can answer within a certain degree. Just like a layman can express an opinion whether somebody is intoxicated or not; or if someone appears to be ill. It's a lay opinion, it doesn't go any further than that."
This ruling does not constitute reversible error. Officer Skaggs testified that compared with the blood flowing from the wound, the blood on the floor "had started darkening, and it was jelled, it was getting real thick." These facts are discernible by laymen and support the commonsense inference that coagulation had begun. State v. Kahey, 436 So.2d 475, 491 (La.1983).
Assignments of Error Nos. 16, 24
Defendant contends the trial court erred in allowing Detective Mitchell to testify that Ford was sought for questioning after police spoke with the victim's neighbors, *1262 and that like error was committed in allowing Detective Rushing to testify that he developed a suspectGlenn Fordfrom information he received from Detectives Mitchell and Datcher.
This testimony was offered, as the trial judge noted, "only [as] evidence of why the officer did what he did next," and not for proof of the matters asserted. As such it is not hearsay. State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied ___ U.S. ___, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); State v. Smith, 400 So.2d 587 (La.1981). Neither of these assignments has merit.
Assignments of Error Nos. 29, 31
Two statements given by the defendant to police on November 6, 1983 were admitted into evidence. In the first defendant generally recounted his prior day's events. In the second he added that he had attempted to sell a gun for "O.B." At trial the defendant attempted to introduce a third such statement, given on November 8, 1983, in which he explained that he pawned some jewelry for "O.B." The prosecution objected to admission of this self-serving declaration and the objection was sustained. The defense next attempted to introduce the fact that an explanation had been given without eliciting testimony on the substance of the explanation. Objection again was raised and sustained. Relying upon broad language found in State v. McDonald, 387 So.2d 1116 (La. 1980), cert. denied 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980) and State v. Guillory, 373 So.2d 133 (La.1979), the defendant claims these rulings violate R.S. 15:450.
The statute provides:
"Every confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."
The November 8th statement, which the state did not seek to use against the defendant, was properly excluded. It was a separate and distinct statement taken two days after the earlier statements. See also Guillory v. Maggio, 690 F.2d 464, 465 (5th Cir.1982) (declining to extend "the Louisiana connection rule" to a period of two days). It has insufficient connexity with the prior statements to justify an exception to the rule.
Assignment of Error No. 35
Defendant contends the trial judge erred in charging the jury as follows:
"You cannot find the defendant guilty solely on circumstantial evidence unless the facts proved by that evidence exclude every reasonable hypothesis of innocence. The defendant is not required to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify.
You may infer that a person in the unexplained possession of recently stolen property is the thief. In considering whether possession of recently stolen property has been satisfactorily explained, you must remember that defendant is not required to testify, to call witnesses, or to produce evidence, and the State must prove every element of the offense charged, beyond a reasonable doubt. If you find that the defendant was in possession of recently stolen property, and that such possession is reasonably consistent with innocence, or if you entertain reasonable doubt of guilt, you must acquit the accused." (Emphasis added).
Removing the underlined sentence from the context of the entire charge, Ford claims the instruction constituted a mandatory presumption "that he was the thief and, thereby, necessarily the murderer;" alternatively, that it shifted the burden of persuasion to him to explain his possession of the jewelry, in contravention of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
We think the plain language of this charge is permissive and that no reasonable jury would have understood it otherwise. Nor is it arguable that this instruction, read as a whole, shifted the burden to defendant to explain his innocence. State *1263 v. Mattheson, 407 So.2d 1150, 1161-62 (La. 1981), cert. denied 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412, reh. denied 463 U.S. 1249, 104 S.Ct. 37, 77 L.Ed.2d 1456 (1983). The sentence to which defendant objects is both prefaced and followed by admonishments that the defendant is not required to testify, and that no inference may be drawn from his silence. The jury was charged by the court and elsewhere told repeatedly that the burden is on the state to prove the defendant committed the murder beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence. This jury instruction is not erroneous.
Assignment of Error No. 36
In his rebuttal argument during the guilt phase of the trial the prosecutor stated:
"[The police] went door-to-door, let one lead to another. Weeks and months to get them to this point. And [Marvella Brown] answers the door, and they finally talked to her, and they got this lead, tells the police in essence that her boyfriend, the man living with her, his brother and the person she knew as `Long Hair' committed a murder ..."
Counsel for defendant objected that to attribute such a statement to Brown was to argue beyond the evidence. C.Cr.P. 774. The objection was overruled. We tend to agree that the statement was improper and that the objection should have been sustained. We are not, however, "thoroughly convinced that the jury was influenced by the remarks and that such contributed to the verdict." State v. Jarman, 445 So.2d 1184, 1188 (La.1984). This assignment has no merit.
Assignments of Error Nos. 37, 38, 39, 43
The defendant contends the prosecution should not have been allowed to present evidence of his prior history of criminal conduct during the penalty phase. He also contends that it should not have been allowed to cross-examine his character witnesses as to prior convictions and arrests, and that the state should have been required to prove the validity of his convictions and arrests in any event before doing so. He suggests a mistrial should have been granted for these reasons.
These contentions are without merit. The defendant's entire past record is open to scrutiny in the sentencing phase of a capital trial. State v. Ward, supra at 588; State v. Hamilton, 478 So.2d 123 (La.1985). The trial judge determined outside the jury's presence that the state had credible grounds for its cross-examination. Nothing more is required. State v. Johnson, 389 So.2d 372, 375-77 (La.1980). The defendant himself admitted to his record when he took the stand. The motion for a mistrial was properly denied.
Assignment of Error No. 45
The defendant contends there was insufficient evidence to support the jury's finding, under C.Cr.P. 905.4(h), that the victim was "an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant." He also contends that this invalid finding injected an arbitrary factor into the sentencing phase, and entitles him to a new sentencing hearing.
In the first contention defendant is correct; the state did not show that Mr. Rozeman was "an `eye witness' to an earlier independent crime alleged to have been committed by the accused." State v. Loyd, 459 So.2d 498, 504 (La.1984). Because we cannot say, however, that "but for the influence of the evidence of the legally insufficient aggravating circumstance, the jury would not have brought in the death penalty," see State v. Wilson, 467 So.2d 503, 522 (La.1985), cert. denied ___ U.S. ___, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985), the sentence will not be set aside on this basis.
Assignments of Error Nos. 46, 47
Ford, a black man, was convicted by an all white jury of killing a white man. The prosecution exercised its peremptory challenges to exclude six blacks and two whites from the jury. The defendant argues he has been deprived of the impartial jury guaranteed him by the Sixth Amendment to the United States Constitution, *1264 McCray v. Abrams, 750 F.2d 1113 (2d Cir. 1984), reh. en banc denied 756 F.2d 277 (1985), and that he is therefore entitled to a new trial as to guilt and as to sentence.
Just two years ago we stated:
"This court continues to adhere to the standard established in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), realizing that the defendant is saddled with a difficult burden. State v. Eames, 365 So.2d 1361, 1367 (La.1978). The defendant must show systematic exclusion of blacks from juries over a period of time. State v. Hayes, 414 So.2d 717 (La.1982); State v. Edwards, 406 So.2d 1331 (La.1981). The defendant in this case has not shown a systematic exclusion of blacks, nor a long-standing policy of the office of the district attorney to exclude black jurors. Without such a showing of systematic exclusion, the state is entitled to exercise its peremptory challenges as it chooses. State v. Berry, 391 So.2d 406 (La.1980)." State v. Williams, 445 So.2d 1171, 1177 (La.1984).
We are not prepared to depart from this standard, whether defendant brings his claim under the Sixth Amendment or the Fourteenth.
Assignment of Error No. 48
The defendant contends that the death penalty should not have been imposed in this case.
Cruel, excessive or unusual punishment is prohibited by Article I, § 20 of the Louisiana Constitution. This court, in accordance with C.Cr.P. 905.9 and Louisiana Supreme Court Rule 28, § 1, reviews each sentence of death to determine:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
There is no evidence in the record that defendant's sentence was imposed under the influence of passion, prejudice or other arbitrary factors. In particular, there is no evidence that the state appealed to racial prejudice in its argument before the jury.
The jury found two aggravating circumstances, one of which we have found invalid. The second aggravating circumstance, that the murder was committed during the course of an armed robbery, is supported by the evidence and is not disturbed.
The final determination is the proportionality of the sentence to sentences imposed in similar cases, considering both the circumstances of the offense and the defendant. Sixteen first degree murder convictions, including the instant conviction, have been returned by juries in Caddo Parish since January 1, 1976. Five involved similar underlying offenses, and in all of these the jury returned a verdict of life imprisonment. Mitigating circumstances were present in each case. There are no mitigating circumstances in the present case.
When compared to the results of other single shot armed robbery cases, the penalty is not disproportionate. See State v. Busby, 464 So.2d 262 (La.1985), cert. denied ___ U.S. ___, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied ___ U.S. ___, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984) cert. denied ___ U.S. ___, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. James, 431 So.2d 399 (La.1983), cert. denied 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); State v. Lindsey, 428 So.2d 420 (La.1983), cert. denied 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246, reh. denied 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983).
The conviction and sentence are affirmed.
DENNIS, J., concurs although disagreeing with the treatment of assignments 37, 38, 39 and 43 because any error therein appears to have been harmless.
*1265 LEMMON, J., concurs and assigns reasons.
CALOGERO, J., dissents and assigns reasons.

APPENDIX
Assignments of Error Nos. 14, 15, 17-23, 25-28, 30, 32-34, 40-42, 44
In Assignment of Error No. 14 defendant contends five photographs were improperly admitted into evidence. These photographs show empty display cases and different views of the duffel bag in relation to the body and the display cases. Defendant claims two of these photographs were poorly developed and misrepresent the color of blood, suggesting a degree of coagulation which had yet to occur, and that a third, in addition to such poor quality, was irrelevant. The reason for the objections to the fourth and fifth photographs are not apparent on the record. We have examined these photographs and find the trial court did not err in admitting them.
In Assignment of Error No. 15 defendant contends the trial court erred in allowing Dr. Braswell to express his opinion as to whether the victim's body showed signs of struggle. Dr. Braswell examined the victim's body at the scene and later performed the autopsy. On direct examination by the state he was asked:
"And what was thedid you notice any trauma to the body, other than the wound?
He answered:
"The only trauma that I found on the body was the gunshot wound."
The question was appropriate and the answer well within the knowledge of the medical doctor who performed the autopsy. There is no merit to this assignment.
In Assignments of Error Nos. 17 and 18 the defendant contends it was error to qualify Lieutenant Lawson as an expert in obtaining fingerprints for comparison, and that it was error to qualify Sergeant Lockwood as an expert in comparing fingerprints. Lieutenant Lawson counted nearly five years' experience in the identification division with extensive "on-the-job" training, seminars on fingerprinting and fingerprint comparison conducted by both the city and parish law enforcement agencies, a two week program of studies in advanced crime scene investigation conducted at Louisiana State University in Baton Rouge, and a forty hour course offered by the Northwest Louisiana Crime Lab in fingerprinting. He had previously been qualified in his field.
Sergeant Lockwood had been a member of the same division for two and one-half years, had completed two forty hour courses offered by the F.B.I., one in fingerprint classification and one in advanced latent fingerprint examinations, and an eighty hour course conducted by the Northwest Louisiana Crime Lab in scientific crime scene investigations.
Defendant objected because the police department had officers with more exhaustive qualifications who were not called to testify. Neither of these assignments has merit.
In Assignment of Error No. 19 defendant contends it was error to allow a crime laboratory technician to testify to normal procedure for storing blood when that procedure was not followed in this case. Although we doubt this line of questioning was relevant, it did not prejudice the defendant. The error, if any, was harmless.
In Assignment of Error No. 20 defendant contends it was error to allow introduction of photographs of his apartment taken by police while executing the search warrant. This evidence was of marginal relevance at best; however, it did not prejudice the defendant.
In Assignment of Error No. 21 defendant contends it was error to allow introduction of a shirt stud seized from Jake Robinson's luggage in California. Although we doubt this evidence was relevant, it was never linked to the robbery and murder, and thus did not prejudice the defendant. The error, if any, was harmless.
In Assignment of Error No. 22 defendant contends it was error to allow introduction of various pieces of jewelry seized from his apartment. These articles were not positively *1266 identified as having been taken from Mr. Rozeman's shop; witnesses testified only that he customarily sold similar items. Introduction of this evidence did not prejudice the defendant.
In Assignment of Error No. 23 the defendant contends it was error to admit a diagram and a transparency of the crime scene, neither of which was drawn to scale. In his objection defense counsel argued these exhibits would confuse the jury.
Detective Lockwood, who prepared both the diagram and the transparency, testified at trial. He stated they were not drawn to scale. Defense counsel stated before the jury that the exhibits were "obviously not drawn to scale." The trial judge was justified in concluding that this evidence would not confuse the jury.
In Assignment of Error No. 25 the defendant contends it was error to admit Sergeant Kemper's videotape of the crime scene. Blood shown in the videotape is of a darker hue than shown in other evidence. The videotape was shown for the purpose of explaining Dr. McCormick's conclusion that Mr. Rozeman was killed by a left-handed gunman. No error was committed in admitting the videotape for this purpose.
In Assignment of Error No. 26 the defendant contends it was error to admit a photographic line-up into evidence. At trial the beer salesman stated he identified Ford in a photograph shortly after the offense, and identified the photograph as the one he had been shown. No error was committed in admitting this photograph.
In Assignments of Error Nos. 27 and 28 the defendant contends it was error to allow Dr. McCormick to express an opinion as to the murderer's purpose in laying the duffel bag on the victim's head, and that it was error to allow Dr. McCormick to estimate time of death. Dr. McCormick, a forensic pathologist, who by his own estimate had investigated between four and five thousand crime scenes at the time of trial, was qualified to express his opinion on both points. Neither of these assignments has merit.
In Assignment of Error No. 30 defendant contends the prosecution's cross-examination of Raymond Franklin, an alibi witness, was allowed to exceed proper bounds. Franklin was called by defendant to place him at the dice game on the afternoon of the murder. At the time of trial Franklin and Ford were incarcerated in the same cell. When Franklin's testimony as to defendant's whereabouts on November 4th varied from a prior statement given police, the state proceeded to ask him if he had recently spoken with defendant about the case. In answering Franklin revealed he was in jail for an unrelated arrest.
Defendant's claim that the witness should not have been questioned as to his incarceration, the charge pending against him or the circumstances surrounding that charge are without merit. The state is entitled to show a witness' interest or bias, or to show he has been corrupted. R.S. 15:492.
In Assignment of Error No. 32 the defendant contends it was error to refuse to admit into evidence the motion for bill of particulars, the state's response to motion for bill of particulars and the state's motion for discovery. These pleadings were offered to show the jury the time the state originally alleged the offense to have occurred. The trial court did not err in refusing to admit these documents.
In Assignment of Error No. 33 the defendant contends it was error to permit Dr. McCormick to rebut the testimony of Dr. Braswell. Dr. McCormick first testified as a witness for the prosecution. Dr. Braswell, testifying for the defense, contradicted portions of Dr. McCormick's earlier testimony. After the defense had rested, the state recalled its witness for further questioning. Under R.S. 15:282 the prosecution has the right to do so. There is no merit to this contention.
Assignment of Error No. 34 relates that Spring James was thirteen years old at the time of the offense and fourteen years old at the time of trial. Her testimony placed Ford "running" down the alley behind the victim's shop shortly after noon. With regard to her testimony, defendant requested that the jury be charged as follows:

*1267 "You have heard the testimony of [Spring James], and you may be wondering whether [her] young age should make any difference. What you must determine, as with any other witness, is whether that testimony is believable. Did [she] understand the questions? Does [she] have a good memory? Is [she] telling the truth?
Because young children may not fully understand what is happening here, it is up to you to decide whether [Spring James] understood the seriousness of [her] appearance as a witness at this criminal trial. In addition, young children may be influenced by the way that questions are asked. It is up to you to decide whether [Spring James] understood the questions asked of [her]. Keep this in mind when you consider [Spring James'] testimony."
The trial judge believed his general charges were sufficient and rejected the defendant's proposal.
A review of this witness' testimony reveals she understood the questions asked of her and responded in an appropriate manner. There is no showing that the special instructions were necessary to aid the jury in evaluating her testimony. The trial judge did not err in rejecting defendant's requested charge.
In Assignment of Error No. 40 the defendant contends it was error to exclude testimony expressing moral opposition to capital punishment. The trial judge did not err in this regard. See State v. Brogdon, 457 So.2d 616, 622 (La.1984), cert. denied ___ U.S. ___, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985).
In Assignment of Error No. 41 the defendant contends the trial judge erred in allowing the state to lead its expert witness during the penalty phase. This was not error.
Assignment of Error No. 42 relates that at the penalty phase Dr. McCormick testified Mr. Rozeman likely knew he was to be killed when the duffel bag was placed over his head. The defense objected on the grounds of relevance, and the objection was overruled.
Admission of this testimony does not amount to error. The state sought by this testimony to show that the murder was especially cruel, heinous or atrocious. The jury did not find this aggravating circumstance.
In Assignment of Error No. 44 the defendant contends the trial judge erred in refusing to order a continuance to permit his common-law wife to travel from California and testify in the penalty phase. The record discloses that defendant told her she would not be needed for trial. It was not error to deny the continuance.
LEMMON, Justice, concurring.
This court has stated that bills of information or indictment are not admissible in the penalty phase of a capital case, because such evidence constitutes a mere accusation and is not reliable proof of the alleged prior misconduct. State v. Sawyer, 422 So.2d 95 (La.1982); State v. Lowenfield, 85-KA-0255 (La., Dec. 2, 1985); State v. Ward, 483 So.2d 578 (La.1986) (Lemmon, J., concurring). The fact of an arrest, which the majority permits to be introduced in the case, is even more unreliable evidence of prior misconduct than a bill of information or indictment, since the latter type of evidence has at least been screened by the district attorney or presented to a grand jury. Even worse in this case, the prosecutor in effect testified to the fact of the arrest (by cross-examining a character witness as to the witness's knowledge of the arrest), giving some indicia of official approval to the action of the law enforcement officer.[1]
The focus of the sentencing hearing in a capital case is on the circumstances of the murder and the character and propensities of the murderer. La.C.Cr.P. Art. 905.2. The prosecutor may therefore introduce certain evidence pertaining to the defendant's character, even if the defendant does *1268 not put his character at issue. Accordingly, this court has allowed the prosecutor to introduce evidence of prior convictions in the penalty phase. State v. Jordan, 440 So.2d 716 (La.1983); State v. Sawyer, above. Evidence pertaining to the defendant's character, however, must be competent and reliable, and evidence of an arrest simply does not meet these requirements.
The prosecutor's procedure of referring to arrests in cross-examining the defendant's character witnesses has been permitted under certain circumstances in guilt trials in non-capital cases.[2] Nevertheless, I have serious doubt that such potentially devastating evidence, which strongly suggests (but does not reliably prove) past misconduct, should be allowed in the penalty phase of a capital case, even in response to evidence of good character. Evidence of prior criminal activity in the penalty phase of a capital case should be presented by reliable proof of misconduct and not by questioning whether a witness has heard that the defendant was arrested for the prior misconduct.[3]
In the present case, nevertheless, any error in admitting evidence of defendant's arrest was harmless beyond a reasonable doubt. The prosecutor questioned defendant's character witnesses about defendant's prior arrest for robbery only after defendant admitted to convictions of fifty-five burglaries in California. Furthermore, the robbery arrest about which the witnesses were questioned involved a separate robbery of the murder victim in this capital case. Since this same jury had already found defendant guilty of robbing and murdering this victim, the questionable procedure could not have been a significant factor in this jury's decision to impose the death penalty.
CALOGERO, Justice, dissenting.
This defendant's conviction rests entirely upon circumstantial evidence. While there was a wealth of incriminating details, I am not convinced that a rational trier of fact could have found the essential elements of the crime of first degree murder beyond a reasonable doubt, Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), especially considering that since the case is based upon circumstantial evidence every reasonable hypothesis of innocence must be excluded. R.S. 15:438; State v. Martin, 458 So.2d 454, 462 (La.1984) and State v. Chism, 436 So.2d 464, 470 (La.1983).

ON APPLICATION FOR REHEARING
We are aware of the United States Supreme Court's decision in Batson v. Kentucky, ___ U.S. ___, 106 S.Ct. 1712, 90 *1269 L.Ed.2d 69 (1986). However, we do not believe that the decision was intended to apply to cases tried before it was handed down. See Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The United States Supreme Court repeatedly denied certiorari when the issue was presented to it in recent years prior to Batson, supra. See, e.g., Thompson v. United States, ___ U.S. ___, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984); Harris v. Texas, 467 U.S. 1261, 104 S.Ct. 3556, 82 L.Ed.2d 858 (1984); Williams v. Illinois, 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984); Gilliard v. Mississippi, 464 U.S. 867, 104 S.Ct. 40, 78 L.Ed.2d 179 (1983); McCray v. New York, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983).
Rehearing Denied.
DIXON, C.J., would apply Batson to this case.
CALOGERO, J., would grant a rehearing.
NOTES
[1] Certain assignments requiring little discussion are treated in the Appendix to this opinion.
[2] "Unique" particles come from gunshot and no other source. "Characteristic" particles may come from other sources, such as car batteries.
[1] It is questionable that the prosecutor followed the guidelines for such questioning outlined by this court in State v. Johnson, 389 So.2d 372 (La.1980).
[2] The focus in a non-capital case (and in the guilt phase of a capital case) is on guilt or innocence. Character evidence is barely relevant, because evidence of good or bad character has little probative value to the issue of guilt or innocence. The prosecutor may introduce character evidence only in rebuttal to that presented by the defendant. La.R.S. 15:481. However, cross-examination of character witnesses on the subject of defendant's arrests has been allowed to prevent a defendant from "profiting by a mere parade of partisans". Michelson v. United States, 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948). As a practical consequence, only a defendant with a spotless reputation ever uses character evidence, and a defendant with previous arrests is effectively forced to forego use of evidence of good character, which is only slightly probative of innocence. This penalty is not disproportionate when balanced against the purpose of the rules of character evidence.

On the other hand, the focus in the penalty phase of a capital case is principally upon the defendant's character. It would be fundamentally unfair to force a defendant with previous arrests to forego use of this highly probative evidence on the central issue of character because the penalty for using such evidence is that the prosecution is then allowed to use unreliable and virtually non-probative evidence of arrests as rebuttal evidence. The penalty on the defendant for using appropriate evidence on the issue of sentencing is too disproportionate to the purpose of preventing a parade of partisans on the issue of guilt.
[3] This court has never squarely decided whether evidence is admissible of an unrelated crime for which the defendant has not been convicted. However, such evidence is arguably admissible if there was clear and convincing evidence of the defendant's connection with the commission of the unrelated crime, if the proffered evidence was otherwise competent, and if the unrelated crime had relevance and substantial probative value as to the defendant's character and propensities.