720 So.2d 637 (1998)
STATE of Louisiana
v.
Michael A. COOKS.
No. 97-KA-0999.
Supreme Court of Louisiana.
September 9, 1998.
Concurring Opinion October 6, 1998.
Rehearing Denied October 9, 1998.
*639 R. Neal Walker, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Paul Carmouche, Dist. Atty., Catherine M. Estopinal, Shreveport, Erin Brainard, Michael A. Pitman, Shreveport, for Respondent.
Concurring Opinion of Chief Justice Calogero October 6, 1998.
VICTORY, J.[*]
Michael A. Cooks was indicted for the first degree murder of Joe Frazier in violation of La. R.S. 14:30. After a bifurcated trial, the jury found the defendant guilty as charged and unanimously recommended a death sentence. This is a direct appeal from that conviction and sentence. La. Const. art. V, § 5(D)(2); La.C.Cr.P. art. 912.1(A). The defendant raises numerous assignments of error for reversal of his conviction and sentence.[1] Finding no reversible error, we affirm the conviction and sentence.

FACTS
On January 20, 1995, the defendant, Michael Cooks, along with Victor Norris, Alvin Bratton, Eric Williams, Justin Griffin, and a man referred to as "Rule Dog," agreed to commit an armed robbery at 3526 Darien Street in Shreveport. The house was occupied that night by the victim, Joe Frazier, and by Ronald Ford and Carlos Bryant. Although testimony by Ford and Bryant, who survived the shootings, and by co-defendant Williams differed as to the details surrounding the robbery and shootings, each of the witnesses testified the defendant walked alone to the front door and knocked. Bryant answered and instructed the defendant, whom he knew, to go the back of the house. The defendant knocked again at the back door, and, when Bryant answered, the defendant entered followed by his five co-perpetrators, all of whom were armed. Defendant was armed with a .45 automatic.
Williams testified as follows. Upon entering the house, defendant asked for marijuana and was given four bags by Ford. Victor Norris, also known as "Slap," pulled out his gun and hit Bryant. One of the men held a gun to Bryant's head and lead him through the kitchen. Defendant and another of the men remained in the back room with Frazier where he had been taken. Williams and Bratton dragged Ford towards the front of the house while defendant kicked a padlocked bedroom door in. At some point, Williams heard a gunshot coming from the back room where Slap remained with Frazier. Williams and Bratton dragged Ford into the formerly locked front bedroom and ransacked the room finding a pound of marijuana. Shortly thereafter, Slap came into the back room, hit Ford, then shot him as he fell to the floor near the window. At the same time, Williams testified that defendant shot Bryant in the hallway. Allegedly scared by the shooting, Williams, Bratton, and Griffin *640 ran from the house, passing Frazier in the front room who was lying on his stomach. As they ran from the house towards the car, Williams heard defendant in the back room where Frazier was lying yell, "kill that bitch."[2]
When Ford's brother Anthony arrived at the house, Bryant told him that M.C. shot him. Anthony knew Bryant was referring to the defendant, Michael Cooks. Anthony found his brother in the bathroom near the hallway and attempted to administer C.P.R. while he waited for the ambulance to arrive. The first police officers to arrive apparently spoke with Ford who identified "J.C. Cooks" as his assailant. When paramedics arrived, they determined Frazier was dead but were able to stabilize Ford and Bryant and transport them to the hospital.
At trial, Williams testified he and Alvin Bratton carried 9 mm automatics, Slap had either a .32 or .38 revolver, and the defendant carried a .45 automatic. Bryant testified Frazier owned a .32 and a .380, both automatics, but was unsure which Frazier had with him the night of the shooting. Bryant had a .357 revolver. Both guns were stolen by the defendant and his co-perpetrators.
The medical examiner testified Frazier had been shot fourteen times. Eleven bullets entered Frazier's back with their trajectory consistent with the victim lying on his stomach on the floor. At least eight of these gunshot wounds were fatal. Ford was shot twice in the hand, twice in the back and once in the head. His head wound required extensive surgery and resulted in brain damage. Bryant was shot twice in the shoulder, twice in the corner of his jaw, and once in the back of his neck. One of the bullets which entered his jaw traveled upwards into his skull and resulted in the loss of sight in one of his eyes.
Expert testimony at trial corroborated portions of the differing accounts of the shootings. Four 9 mm shell casings were found in the back room in a semi-circle around the couch and Frazier's body. Four.45 shell casings were found in the back room. One was found at Frazier's feet; the other three were found leading away from the back room towards the kitchen. Six bullets were found near Frazier, some imbedded in the floorboards underneath him. Three of the bullets were fired by a .45 automatic, two were fired by a 9mm automatic, and one was fired by a .32 revolver. Seven .45 shell casings were recovered in the hallway and in the bathroom near where Ford was found by his brother. One bullet jacket and one bullet core, each consistent with either a .38 or a .357, were found in the living room where Anthony Ford found Bryant, and one .38 or .357 bullet was found in the bedroom which had been ransacked. Finally, four .32 bullets were removed from Frazier's body during the autopsy; one .45 bullet had passed through him and lodged in his clothing.
Shortly after the shootings, both Bryant and Ford identified the defendant as one of the perpetrators from two different photographic line-ups. They also identified Bratton, Griffin and Williams. Victor Norris, also known as Slap, was implicated by his coperpetrator's testimony. The defendant's girlfriend, Tina Henderson, and her sister, Charlene, later gave police letters written to them by the defendant. In one letter, the defendant told Charlene he and Slap had participated in the robbery and shooting.[3] *641 He explained that they had planned to rob the victims of marijuana, and shortly after arriving in the house, Slap began shooting. Defendant wrote that because Ford, Frazier and Bryant knew him, he shot them and left them for dead lest they report the shooting. He also wrote that he had ordered that the survivors, Bryant and Ford, be killed. Defendant told Charlene much the same story over the phone when he called her from jail.
Although eyewitness testimony was somewhat inconsistent, each of the three witnesses agreed the defendant was in charge the night of the shooting and that he ordered the killing of at least one victim, Frazier. Moreover, each of the three eyewitnesses, along with other witnesses familiar with the defendant, testified at the guilt phase that the defendant, known on the street as "Mad Monsta Crip," was an "Original Gangster," or "O.G.," a leader of the Wilkenson Terrace Rollin' 60's gang. The prosecutor argued in closing that each of the co-perpetrators was bound to obey defendant's order to kill in light of defendant's "O.G." status. The jury returned a verdict of guilty as charged.
At the penalty phase, the state introduced evidence of three of defendant's offenses, simple burglary, aggravated assault, and attempted second degree murder. With respect to the latter, Deputy Ricky York, an officer at CCC Parish Jail, testified that on August 22, 1995, shortly before the instant trial, defendant initiated a fight in jail with fellow inmate Jackie Sampson for which he was later charged with attempted second degree murder.
Prosecutors also called Charlene and Tina Henderson to testify. Charlene read extensively from defendant's letters, including portions in which he threatened Tina's life and described a prison riot which he initiated.
Finally, Officer Chad Zimmerman was qualified as an expert in gang violence and testified regarding the history of gangs in America and their expansion from Los Angeles, where they originated, into other parts of the country, including Shreveport. Zimmerman explained that every gang is extremely violent, and that someone the age of the defendant would be an original gangster, or a leader of the gang. Zimmerman also read and interpreted letters written by defendant, including one in which defendant, according to Zimmerman, explains how he is threatening a cell mate from another gang. Zimmerman also read threats against Tina and indicated he believed defendant would kill Tina if released because Tina cheated on him and lied about being pregnant. On cross-examination, Zimmerman stated that to be an O.G., one must have committed more than one serious felony and that it would be unusual for a 32-year-old [defendant's age] to have joined a gang recently.
As evidence of mitigation, the defendant's oldest sister testified their mother began beating defendant when he was six. Defendant's niece, his oldest son, Rodrickus, and Rodrickus' mother testified the defendant is a good father and uncle. Rodrickus read a letter from his father in which defendant cautions him not to join a gang. Defendant also called Dr. Mark Vigen, a psychologist, who testified the defendant was raised in a violent environment and is moderately mentally retarded. Vigen explained the effects of abuse on children which include a loss of self-control. He also expressed his opinion defendant would do well in prison and had a positive relationship with his son.
The jury determined defendant should be sentenced to death after finding as aggravating circumstances: (1) that the defendant *642 was engaged in the commission or attempted commission of armed robbery or first degree robbery or simple robbery; and (2) that the defendant knowingly created a risk of death or great bodily harm to more than one person. This appeal followed.

DISCUSSION

I. Guilt Phase Assignments of Error

A. Defendant was denied a fair trial by the state's repeated argument and introduction of evidence concerning his position as an "Original Gangster" in the "Rollin' 60's" gang. Alternatively, trial counsel rendered ineffective assistance for failing to timely object.
Before trial, the state filed notice of its intent to introduce evidence of "other crimes" during both the guilt and penalty phases of the trial. Defense counsel did not request a hearing regarding the admissibility of the evidence. See State v. Prieur, 277 So.2d 126, 130 (La.1973).[4] Moreover, defense counsel did not object to much of the testimony during trial which established the defendant was a member of the Rollin' 60's Crips, that his street name was "Mad Monsta Crip," and that he was an "Original Gangster," a leader of the gang. Defendant also asserts trial counsel failed to object during the prosecution's closing argument which contained eleven references to defendant as the Mad Monster and two references to him as the "Original Gangster."
Although defendant argues on appeal his membership in the Rollin' 60's was irrelevant, inadmissible "other crimes" evidence, the record reveals trial counsel failed to object contemporaneously to the admission of the gang evidence and consequently, the claim is not reviewable. La.C.Cr.P. art. 841; State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, ___ U.S. ___, 117 S.Ct. 162, 136 L.Ed.2d 106, reh. denied, ___ U.S. ___, 117 S.Ct. 546, 136 L.Ed.2d 429 (1996).
Nevertheless, defendant argues various objections and motions for mistrials made by trial counsel adequately preserved the error for review. Although trial counsel did object sporadically to the introduction of gang evidence, not once did trial counsel base a contemporaneous objection on the erroneous introduction of "other crimes" evidence and cite La.C.E. art. 404(B). In one cited portion, trial counsel argued the admissibility of defendant's letters to his former girlfriend and her sister, not the admissibility of his gangster status as "other crimes." Further, in trial counsel's first motion for a mistrial, made after the prosecution's opening statement, counsel argued mainly that the state's reference to defendant as the "Mad Monsta Crip" was overly prejudicial. He also asserted somewhat vaguely that the reference "probably falls within Article 2, referring to other crimes." The trial court ruled the objection was untimely because it was not made contemporaneously with the opening statement. In his second motion for a mistrial, made after the prosecution introduced the gang affiliation sheet, trial counsel argued the reference to defendant's gang membership was an improper attack on defendant's character, not because it was improper "other crimes" evidence, but because defendant had not yet "opened the door." Consequently, his objections do not preserve the error for review under Taylor.
Recognizing this deficiency, defendant argues trial counsel rendered ineffective assistance by failing to object contemporaneously to the admission of gang evidence. A claim for ineffective assistance of counsel is properly raised in an application for post conviction relief. State v. Burkhalter, 428 So.2d 449 (La.1983). This enables the judge to conduct a full evidentiary hearing on the matter. State v. Seiss, 428 So.2d 444 (La. 1983). In our view, the record does not contain sufficient information to rule on this issue. Consequently, this argument is best relegated to post-conviction relief.
This assignment of error lacks merit.

*643 B. The trial court erroneously allowed the introduction of a gang affiliation statement made involuntarily by defendant and procured in violation of his right against self-incrimination and his right to counsel.
Defendant argues the trial court erroneously allowed the introduction of a document, signed by defendant upon his admission to the parish prison, which indicated he was a member of the Rollin' 60's. The form reads:
I certify that by affixing my signature to this document, I am [circled] ... affiliated with any [sic] street gang. I fully understand that by making this statement, should it prove untrue, I could be placing myself in physical danger and that the Caddo Parish Sheriff's office will not assume any responsibility due to my actions.
The document is signed by defendant, witnessed by a lieutenant, and, above a line marked "gang affiliation," defendant has marked "Rollin' 60's."
The document was sought to be admitted in connection with the forensic document examiner's testimony in support of his conclusion that defendant had written certain letters to Charlene Henderson. Prior to trial, the examiner had requested a second exemplar of defendant's handwriting after determining defendant had attempted to disguise his handwriting in the first set. When the defendant refused, the state thereafter provided the expert with examples of defendant's handwriting which defendant had written while incarcerated. These included laundry requests, complaints against guards, and the gang affiliation sheet.
In order to properly introduce these samples, the state called the jail records custodian and sought to introduce the gang affiliation sheet. Defendant objected to the admission of the gang affiliation sheet, arguing the document "deal[s] with his character, and [defendant] has not put his character at issue because he has not taken the stand." The state argued defense counsel's objection was unfounded because counsel had questioned jurors during voir dire regarding defendant's gang affiliation and, further, that the sheet was admissible as evidence of "specific intent and the matter of principles [sic]." The court, presumably noting that the state had countless records containing defendant's writing, asked,
[t]o make sure, does this letteris this letter necessary for the state?
[BY THE PROSECUTOR] Your Honor, that letter is another regularly conducteddocument that's used in the regular business practices of the jail.
...
[BY THE COURT] I understand that; I am asking you: Is this letter necessary or... another one suffice?
[BY THE PROSECUTOR] It's got his signature on it. It is something the handwriting expert will match up to other documents. Goes to the authenticity ofit's been admitted by defense counsel that he is a Rolling Sixties Crip. It goes to show that that is in fact him. I mean, he voir dired on this matter. I don't see how it could be prejudicial.
[BY THE COURT] I understand that. What I am asking you is: Is this particular letter necessary for your case, or can you prove what you are attempting to prove with the other documents you have?
[BY THE PROSECUTOR] I think it is not that we have other documents with his signature on it. It just goes to show the authenticity of all the jail records, that they are in fact him, you know.
[BY THE COURT] All right ... The court will sustain the objection as to this document.
Although the court initially sustained the objection, the court later withdrew that ruling after a bench conference held off the record.
The court explained:
My understanding [is that] the state will not attempt to introduce them in evidence at this time and in the presence of the jury. Even if they offered to introduce them in the presence of the jury, if defense counsel makes objection...if you offer to introduce them in evidence, the court will consider that, but any arguments to be made to the documents outside the presence of the jury. I will reserve the defense *644 counsel's right to argue the introduction of each of the documents and whether or not they are to be published.

Defense counsel thereafter did not object when the prosecutor elicited the following testimony from the jail records custodian:
Q. State's exhibit 43, can you tell me what this document is?
A. Yes, sir. This is a gang affiliation sheet. It's filled out by an arrestee ...
Q.... And can you read the signature here?
A. Yes, sir. Michael Cooks ...
Q. What's the gang affiliation?
A. Rolling Sixties.
At the conclusion of the testimony, defense counsel made a motion for mistrial citing the erroneous admission of the gang affiliation sheet. The court denied the motion, noting that previous references to defendant as a gang member by numerous other witnesses dissipated any prejudice to defendant from the records custodian's testimony and that defense counsel had already informed the jurors that defendant was a gang member.
In this assignment of error, defendant argues the document was erroneously admitted as it was obtained involuntarily and in violation of defendant's right to counsel and his right against self-incrimination. Defendant raises these arguments for the first time on appeal and consequently, they are not preserved for review. La.C.Cr.P. art. 841; State v. Taylor, supra; State v. Sims, 426 So.2d 148, 155 (La.1983) (a new basis for an objection may not be urged for the first time on appeal). Furthermore, defendant does not challenge the court's ruling that any prejudice to defendant resulting from admission of the gang affiliation sheet was minimal in light of other references to defendant's gang status.
This assignment of error lacks merit.

II. Penalty Phase Assignments of Error

A. The trial court erroneously curtailed defendant's ability to rebut evidence regarding his attack on another prisoner while in jail.
Defendant complains of curtailment of his ability to present mitigation evidence. At the penalty phase, the prosecutor introduced evidence of an unadjudicated attempted second degree murder which occurred on August 22, 1995, during defendant's incarceration for the murder of Frazier. The prosecution called Deputy Ricky York who testified that defendant initiated a fight with another inmate, Jackie Sampson. Eight officers interceded and were able to separate the two inmates. Officers discovered that defendant was armed with a "shank," a home-made knife, which he used to scratch Sampson's back and stab him in the face. Prosecutors introduced two sets of photographs depicting the injuries suffered by Sampson.
On cross-examination, Deputy York denied any knowledge of prior altercations between defendant and Sampson, and the prosecutor's objection was sustained when defense counsel attempted to ask the witness whether he was familiar with Jackie Sampson's disciplinary records. Later, out of the presence of the jury, York again denied knowing of any other altercations involving Sampson but acknowledged that Sampson was held at times in another part of the jail where York had no guard duties.
At the conclusion of the state's presentation of evidence at the penalty phase, the trial court denied defense counsel's request to introduce Jackie Sampson's jail records, including disciplinary records detailing fights Sampson was involved in and weapons seized from him. These records were proffered as was testimony by the jail records custodian that officers had discovered a shank in Sampson's possession on two occasions, one of which included the day the defendant and Sampson fought when officers discovered a razor blade under Sampson's bed.
We have reviewed Sampson's disciplinary records which were offered as Defense Proffer 1. The records reflect Sampson and defendant may have fought once before and that Sampson bragged, "I hit that nigger and I hope I broke his jaw ... that nigger is hurt and hurt bad." Further, the records reveal that after the stabbing, Sampson "was seen opening the tray hatch of cell 17 to throw fecal matter on inmate Cooks." The records *645 are replete with numerous disciplinary violations by Sampson and clearly indicate he was not a model prisoner.
Defendant argues the exclusion of evidence of Sampson's conduct while in prison gave the jury a one-sided view of defendant's attack on him which led to the attempted second degree murder charge. He argues this was significant because during closing arguments, the state emphasized defendant would be a dangerous prisoner if he were sentenced to life imprisonment, using the Sampson altercation as proof:
How much murder, destruction, and mayhem can one person give? When does it stop? That's what you have to ask yourself. Will a life in prison make it stop? You know the answer to that. Jackie Sampson knows the answer to that.
During its rebuttal, the state again noted defendant would be a dangerous prisoner.
Oh, give him life in prison; he won't hurt anybody while he's in there. Well, you know, there's passages in that Bible[5] that says an eye for an eye; and I'll bet Jackie Sampson and Carlos Bryant think that's the passage you ought to be reading.
What has he been doing since he has been in prison? Well, he has been going to workshop and been making his tools. His tools of killing, mayhem, and destruction. You know, ladies and gentlemen, these don't only stab inmates.
`Kicked a ride up last night, Nicky old girl. They locked me down. The guard got my face and I punched him. They think I'm crazy.'
Ladies and gentlemen, are your twelve votes going to be the gunshots, as [defense counsel] says? ... Or are you going to wake up maybe next year, next month, tomorrow, twenty years from now and find out that somebody down at Angola got stabbed and killed and it just might not be another inmate, although they have every right to live, too. Just might be somebody's daddy, brother, son, who's trying to make a living as a guard.
Both this court and the United States Supreme Court have repeatedly stressed a capital defendant has the right to introduce virtually any evidence in mitigation at the penalty phase of a capital trial. Lockett v. Ohio, 438 U.S. 586, 605-606, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); State ex rel. Busby v. Butler, 538 So.2d 164 (La.1988). That evidence includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604, 98 S.Ct. at 2966 (emphasis added). See Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (barring from capital sentencing hearing evidence on defendant's adjustment and good behavior while in prison violates his right to present all relevant evidence in mitigation) and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)(refusal to consider family history and childhood abuse of 16-year-old facing the death penalty as mitigating factors violates the Eighth Amendment).
Defendant argues that had he been able to present for the jury's consideration evidence of Sampson's violent character, the jury would have inferred that "appellant only presented a threat to violent, frequently armed prisoners who had histories of assaulting him." In support of this assertion, defendant cites Lockett v. Ohio, supra, and State v. Bernard, 608 So.2d 966 (La.1992), and argues these decisions either allow the introduction of the evidence in question or could be extended to allow its admission. Defendant stretches the Lockett and Bernard rulings beyond their limits. He argues that evidence of Sampson's prior violent acts is relevant to explain his own "record." However, Lockett focused on mitigating evidence as to the "circumstances of the offense," and not as to "other crimes" introduced during the penalty phase. Lockett, 438 U.S. at 604, 98 S.Ct. at 2966. Defendant would have the penalty phase transformed into an inquiry into the worth, or lack thereof, of victims of "other crimes." Neither Lockett nor Bernard contemplate the admission of such evidence.[6]
*646 Furthermore, had defense counsel presented evidence of Sampson's violent tendencies it seems reasonable to conclude that the state could rebut that evidence with evidence of defendant's disciplinary record which, offered as State Proffer 1, reveals defendant had been involved in many different fights while incarcerated. Further, the jury was already aware defendant had initiated a riot in the prison and would soon learn during gang expert Zimmerman's testimony that defendant intended to beat a member of a rival gang with whom he shared a room. Given this damaging evidence, it is unlikely the jury would conclude that defendant attacks only other violent inmates.[7]
Defendant also relies on Skipper, supra, arguing the "jury could have drawn favorable inferences from [the excluded] testimony regarding petitioner's character and his probable future conduct if sentenced to life in prison." Skipper, supra, 476, U.S. at 4, 106 S.Ct. at 1671. In Skipper, a capital defendant was barred from presenting the testimony of two jailers and one "regular visitor" to the effect that he had made a "good adjustment" during his time spent in jail. Skipper, supra, 476 U.S. at 3, 106 S.Ct. at 1670. Defendant and his wife had already testified defendant had conducted himself well while incarcerated; however, the Court concluded this evidence was "the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnessesand, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their chargeswould quite naturally be given much greater weight by the jury." Id., 476 U.S. at 8, 106 S.Ct. at 1673. The Court held the exclusion of "relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender," and reversed defendant's death sentence accordingly. Id.
The instant situation is distinguishable from that presented in Skipper, however. First, defendant was able to rebut the state's assertion he would be a dangerous addition to the prison population. Defendant called psychologist Dr. Mark Vigen who testified at the penalty phase that defendant would "adjust to prison life and become a settled inmate and w[ould] live out his life there and w[ould] do well there."
Second, the evidence defendant sought to admit did not mitigate defendant's attack on Sampson. Clearly, defendant and Sampson had an ongoing feud while they were incarcerated together. One fight precipitated another, with Sampson retaliating for being stabbed by dumping fecal matter on defendant. Defendant argues that without evidence of Sampson's violent character and the various altercations he and Sampson were involved in, the jury was presented with a one-sided version of events, a version which did not accurately depict the defendant's character. However, the evidence of a prior *647 altercation between the two inmates would have established that defendant held a grudge against Sampson for an earlier attack and possibly armed himself with a shank so as to seek revenge at the earliest opportunity. Unlike in Skipper, supra, the jury most likely would have drawn negative inferences from this evidence.
Nor was the evidence of Sampson's generally bad character admissible in mitigation. Absent any indication defendant was aware of Sampson's prior violent acts against others, the evidence did nothing to illuminate defendant's character for the jury. Defendant argues the jury was left with the impression that defendant attacked a "peaceful, nonviolent prisoner." However, as the state correctly notes, the jury was aware that Sampson was awaiting trial for second degree murder when he was attacked by defendant.
Evidence that guards had found shanks in Sampson's cell before and shortly after the fight between the two inmates arguably might have lent some support to defense counsel's insinuation that Sampson carried the shank to the fight and defendant wrestled it away from him before stabbing him. However, although Deputy York acknowledged on cross-examination he did not see the shank until it was pried from defendant's hand at the end of the fight, he testified on redirect that defendant "threw the first blow" which was "an overhand stabbing motion," possibly an indication that defendant came to the fight armed with the shank. Consequently, assuming defendant was unaware of the shanks discovered in Sampson's cell, and nothing in the record indicates otherwise, the evidence was irrelevant and properly excluded.
This assignment of error lacks merit.

B. The trial court erroneously allowed testimony regarding defendant's gang affiliation as well as testimony by a gang expert.
Defendant argues testimony by a gang expert regarding his gang affiliation rendered his sentencing hearing fundamentally unfair. He asserts much of the evidence introduced was irrelevant and highly prejudicial and injected an arbitrary factor into the sentencing proceedings.
Officer Chad Zimmerman was qualified as an expert in gang violence with no objection by defense counsel. Zimmerman discussed the history of gangs in Shreveport, the types of illegal conduct that gang members are generally involved in, and the types of conduct necessary for one to become the Original Gangster or "O.G."[8] He also stated that a *648 gangster in his mid-thirties would definitely be an O.G. After concluding this introduction, Zimmerman was asked to interpret the letters sent by defendant to Charlene Henderson. He noted the letters were written in gang script, a particular style used to alert other gang members that the writer is also a gang member.
Zimmerman interpreted one letter to mean that defendant had started a riot in prison and was threatening to harm his cellmate.[9] Zimmerman then read from letters to Charlene Henderson in which defendant explains he has just learned his girlfriend, Tina Henderson, had lied when she told him she was pregnant and that she turned him into the police. He threatens the sisters in very violent and graphic terms throughout these letters.[10]
On cross-examination, Zimmerman explained that an O.G. need not come from Los Angeles and that a baby born into a gang family is also an O.G. "because it came from two gang members." Age was not necessarily the determining factor, Zimmerman continued, but instead, O.G. status is determined primarily based on what violent crimes a *649 gangster has committed. For example, killing and "jack[ing] a car" would allow only entrance into a gang, but killing gangsters from a rival gang in front of witnesses would confer O.G. status. On redirect, Zimmerman indicated that if he knew an individual had entered a gang at the age of thirty-two, as defendant apparently did, he would find it so unusual that he "would start an investigation and see where he came from, what he's into, and what he's trying to take over."
Defendant argues the introduction of portions of the letters combined with Zimmerman's testimony and the earlier admission at the guilt phase of the gang affiliation sheet and testimony which revealed defendant was a member of a gang injected an arbitrary factor in his sentencing hearing and demands reversal of his death penalty.
We first note defense counsel did not object to the expert's testimony, but only objected to the admission of certain portions of the letters written to Charlene. However, we held in State v. Taylor, supra, that we will review errors occurring during the sentencing phase, whether objected to or not, because of our duty under Rule 28 and La. C.Cr.P. art. 905.9 to review every death sentence for excessiveness by examining the record for passion, prejudice or arbitrary factors which may have contributed to the death penalty recommendation. We emphasize, however, that the goal of the contemporaneous objection rule of La.C.Cr.P. art. 841(A) and La.Code Evid. art. 103, "to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings," Taylor, 669 So.2d at 368, are just as valid in the penalty phase as in the guilt phase. In any event, we must review the gang expert testimony to consider whether it injected arbitrary factors or prejudice into the death penalty phase. "Arbitrary factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed `wantonly or freakishly' or for discriminatory reasons." State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 21-22, cert. denied, ___ U.S. ___, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998) (citing Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). If an arbitrary factor was introduced, we must determine whether "there is a reasonable possibility that the evidence complained of might have contributed to the [sentence]," and "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 87 S.Ct. 824,17 L.Ed.2d 705 (1967).
In capital cases, the required focus of the penalty phase is on the circumstances of the offense, the character and propensities of the offender, and the aggravating and mitigating factors. Comeaux, supra at 26; La.C.Cr.P. arts. 905.2 A, 905.4 and 905.5. The character of the defendant is automatically at issue, whether the defendant has placed his character at issue or not. State v. Jackson, 608 So.2d 949, 953 (La. 1992); La.C.Cr.P. art. 905.2
The United State Supreme Court has held that evidence of a defendant's gang membership may be admissible at a capital sentencing hearing provided the evidence is relevant. Dawson v. Delaware, 503 U.S. 159, 165, 112 S.Ct. 1093, 1097, 117 L.Ed.2d 309 (1992), see also United States v. Abel, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). In Dawson, the Court concluded the trial court erroneously allowed the admission of evidence of defendant's membership in a prison gang because the evidence, as it was presented to the jury, was irrelevant to the sentencing proceedings. The state and the defense had agreed to a stipulation which provided that:
The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.
Dawson, supra, 503 U.S. at 162, 112 S.Ct. at 1096.
The prosecution also informed the jury that defendant had tattooed "Aryan Brotherhood" *650 on his hand and had introduced himself as "Abaddon" which he said meant "one of satan's disciples." Id. The Court held that the "narrowness of the stipulation left the Aryan Brotherhood evidence totally without relevance to Dawson's sentencing proceeding," because the evidence was not tied in any way to the murder for which defendant was being sentenced. Id., 503 U.S. at 165, 112 S.Ct. at 1097. Further, because the prosecution did not introduce evidence that "the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts," the evidence was not relevant to prove any of the aggravating circumstances advanced by the state. Id., 503 U.S. at 166, 112 S.Ct. at 1098. Significantly, for our purposes, the Court noted the prosecution's expert witness, who was not called to testify, would have testified that the Aryan Brotherhood was "associated with drugs and violent escape attempts at prisons, and advocates the murder of fellow inmates." The Court observed that if such evidence had been presented, the Court would have had "a much different case." Id., 503 U.S. at 165, 112 S.Ct. at 1097. The Court further explained that "[i]n many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." Id., 503 U.S. at 166,112 S.Ct. 1093.
The case at bar is the "much different case" the Supreme Court described. The gang expert's testimony described violent and drug-related conduct that is engaged in and endorsed by Rollin' 60's gang members and which, given defendant's membership in the gang, is highly relevant to defendant's character and his future dangerousness. His testimony was also necessary and relevant to interpret the letters written by defendant in which he threatens his cellmate, Tina, and Charlene. Thus, the prosecution in the instant case escaped the trap illustrated in Dawson by introducing strong evidence to establish a relevant link between the defendant's character, his sentencing, and evidence of his gang involvement.
Furthermore, contrary to defendant's assertions, the evidence of gang drug involvement does not constitute the type of nonviolent unadjudicated "other crimes" evidence prohibited by State v. Jackson, 608 So.2d 949 (La.1992) because no specific crimes were associated with the defendant. In addition, it is common knowledge that gang members engage in drug-related and violent crimes; thus, the expert testimony can hardly be characterized as arbitrary, prejudicial, or even surprising to the jury.
The threats of violence or death to the Henderson sisters and the confession that defendant started a riot in prison, which were contained in the letters, involve violence and thus are admissible under Jackson. Moreover, although the state introduced no independent evidence of the riot, this court recently held that although an accused cannot be convicted of a crime based solely on his own uncorroborated confession without some independent proof that a crime has been committed, the confession-corroboration requirement is not necessary before a confession may be admitted at the penalty phase of a capital trial. State v. Connolly, 96-1680, p. 15 (La.7/1/97), 700 So.2d 810, 820. "[I]f the admitted confession is reliable and trustworthy, then it alone may be sufficient to satisfy the clear and convincing evidentiary standard" established in State v. Brooks, 541 So.2d 801 (La.1989). Connolly, 96-1680, p. 15, 700 So.2d at 821 (emphasis in original). Here, as in Connolly, "[t]here is no evidence in the record to suggest defendant's confession [to the riot] was anything other than voluntary and the product of defendant's uncoerced free will." Id.
Furthermore, the Supreme Court in Dawson left open the possibility that the wrongful admission of gang evidence at sentencing could be characterized as harmless error. Dawson, supra, 503 U.S. at 169, 112 S.Ct. at 1099. Thus, even assuming the admission of part of the gang expert's testimony was erroneous, it is harmless error under Chapman unless "there is a reasonable possibility that the evidence complained of might have contributed to the [sentence]," and "the court [is] able to declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman, supra, 386 U.S. at 24, 87 S.Ct. at 828,17 L.Ed.2d at 710-11.
*651 The state presented overwhelming evidence of defendant's guilt in the instant case. Consequently, we conclude the conviction in the instant case surely was unattributable to the erroneous admission of evidence of defendant's gang affiliation during the guilt phase. Further, the gang expert's testimony at the penalty phase pales in comparison to the violence of the crime in question about which the jury had already heard in detail. It is also common knowledge that gang members are involved in violent activities. In addition, the content of the letters which Zimmerman read to the jury were so graphic and violent on their own that Zimmerman's interpretation of them did not add any arbitrary factor into the jury's deliberation. Thus, while we recognize that in the appropriate case the admission of gang expert testimony may constitute reversible error, we conclude that in this case, there is not a reasonable possibility that it contributed to the sentence, and its admission was harmless beyond a reasonable doubt.
Accordingly, this assignment of error lacks merit.

Capital Sentence Review
Under La.C.Cr.P. art. 905.9 and La. S.Ct. R. 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to the statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report, and the Department of Corrections has submitted a Capital Sentence Investigation Report. In addition, the state filed a Sentence Review Memorandum. The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate the defendant is a black male born on June 27, 1961. He graduated high school in special education. Testing revealed an I.Q. of 78, within the seventh percentile of measured intelligence, and a fifth-grade reading level.
Defendant is the fourth of seven children. His father died in 1963 leaving him to live with his abusive mother. He was ten when his sister died from drowning and 34 when his oldest brother died from a gunshot wound. Defendant has never been married, but has fathered four sons, none of whom received support from their father at the time of the offense, although Rodrickus Johnson, his son by Essie Johnson, testified at the penalty phase that he has a good relationship with his father.
Defendant began drinking and smoking marijuana at the age of 20. His drinking and marijuana use progressively worsened and he admits he eventually smoke and drank throughout the entire day. When he was 26 he began smoking crack cocaine and started using PCP. He would steal or work to get the money for drugs and alcohol. Defendant has worked at various jobs. Defendant has never received welfare benefits or unemployment although he has not worked since 1993 or 1994. Defendant indicated to a psychologist he joined the Rollin' 60's two or three years before the instant offense and denied any gang-related violence.
Defendant has two prior convictions, one in 1989 for simple burglary which resulted in three years of supervised probation and one in 1994 for aggravated battery which resulted in a nine-year prison term. His arrest record reveals 11 additional arrests over the course of a ten-year period. One arrest for illegal carrying of a weapon and two arrests for aggravated assault in 1985 and 1986 were nolle prosequied. In 1988, defendant was arrested for solicitation but no disposition was found. In 1992, defendant was arrested for aggravated battery but the charge was dismissed. In 1993, defendant was charged with "loud noise" and paid a fine, and was arrested for simple battery but pled guilty to disturbing the peace. In 1994, presumably after an early release from his aggravated battery jail term, defendant was arrested for simple battery but the charges were dismissed. Defendant also related to his court appointed psychologist he had been arrested in high school for assault and placed on *652 probation. Finally, while incarcerated, defendant attacked another inmate and was charged with attempted second degree murder.

A. Passion, Prejudice, and Other Arbitrary Factors

The defendant argues a number of matters injected arbitrary factors into the proceedings. The claims are treated under the individual assignments of error. All of these arguments are without merit.

B. Aggravating Circumstances

At trial, the state urged two aggravating circumstances and both were found by the jury: (1) that the defendant was engaged in the commission or attempted commission of armed robbery or first degree robbery or simple robbery; and (2) that the defendant knowingly created a risk of death or great bodily harm to more than one person. The evidence presented at the sentencing hearing clearly was sufficient to support the jury's finding of both aggravating circumstances. Defendant's confession and co-defendant Williams' testimony established defendant and his co-perpetrator went to the scene of the shooting to steal drugs, and that they took marijuana from the house and money from Bryant while armed. La. R.S. 14:64 defines armed robbery as the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
This court has stated the immediate control requirement of the armed robbery statute is satisfied when property taken is within the presence of the owner. State v. Refuge, 300 So.2d 489 (La.1974). This court has further noted that armed robbery may occur where property taken is not in actual contact with the victim. State v. Verret, 174 La. 1059, 142 So. 688 (1932); State v. Boelyn, 432 So.2d 260, 261-262 (La.1983). Clearly, the evidence presented was sufficient to support the jury's determination that defendant and his co-perpetrators killed Joe Frazier while "engaged in the perpetration ... of ... [an] armed robbery." La. R.S. 14:30. See also La. R.S. 14:24 ("[a]ll persons concerned in the commission of a crime whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.") and State v. Brooks, 505 So.2d 714, 718 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987) ("Even if, as claimed, defendant did not personally pull the trigger, his presence and assistance ... provided a basis from which the jurors could have concluded that he actively acquiesced in th[e] use of deadly force.") Finally, given the injuries suffered by the two surviving victims, including the loss of the use of one eye and brain damage, the jury properly concluded the defendant knowingly created a risk of death or great bodily harm to more than one person in a single consecutive course of conduct. La. C.Cr.P. art. 905.4(A)(4); State v. Welcome, 458 So.2d 1235, 1245 (La.1983), cert. denied, 470 U.S. 1088,105 S.Ct. 1856, 85 L.Ed.2d 152 (1985).

C. Proportionality Review

Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
The state's Sentence Review Memorandum reveals that since 1976, jurors in the First Judicial District, have returned a guilty verdict for a first degree murder charge in 25 cases, including the defendant's case, and recommended imposition of the death penalty on six occasions before the current case. Only three of those cases involved armed *653 robbery murder.[11] Nevertheless, on a statewide basis, this court has consistently affirmed death penalties in other cases involving killings during the course of a robbery. State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246, reh'g denied, 464 U.S. 1004, 104 S.Ct. 515, 78 L.Ed.2d 702 (1983)(Jefferson Parish); State v. Mattheson, 407 So.2d 1150 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412, reh'g denied, 463 U.S. 1249, 104 S.Ct. 37, 77 L.Ed.2d 1456 (1983)(Orleans Parish); State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983)(Jefferson Parish); State v. James, 431 So.2d 399 (La.1983), cert. denied, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247, reh'g denied, 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983)(Orleans Parish); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984)(Bossier Parish); State v. Busby, 464 So.2d 262 (La.1985), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985), sentence vacated, 538 So.2d 164 (La.1988)(Vernon Parish); State v. Thompson, 516 So.2d 349 (La.1987), (Orleans Parish); State v. Messiah, 538 So.2d 175 (La. 1988), cert. denied, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990)(Orleans Parish); State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359, reh'g. denied, 513 U.S. 1066, 115 S.Ct. 687, 130 L.Ed.2d 617 (1994) (Caddo Parish).
In Davis, a Caddo Parish case, the defendant shot a Circle K employee three times while engaged in an armed robbery of that store. The next evening, the defendant shot an employee of Fat's Exxon in another armed robbery, which was caught on tape. While the victim was placing small items in a paper bag, the defendant bent down, pulled a pistol out, and in one quick and continuous motion, without saying anything, shot the victim in the chest at point blank range. The defendant immediately shot at the victim's wife and threatened, as he emptied the cash register, to shoot the victim again. Id. at 1017-18. In State v. Ford, 489 So.2d 1250, 1264 (La.1986), another Caddo Parish jury sentenced a defendant to death for a single shot armed robbery-murder of an elderly jeweler. The victim's body was found in his watch repair shop. He had been shot once through the head, the shop display cases had been emptied of jewelry, and the victim's pockets had been turned out. Finally, in State v. Tyler, 175,282 First Judicial District, 97-0338 (currently on appeal), a third Caddo Parish jury sentenced defendant to death for shooting three employees of a Pizza Hut, each in the head, during an armed robbery. Two victims survived the head injuries while a third died from two gunshot wounds.
Moreover, while this court has affirmed death penalties in cases of a single-shot armed-robbery murder, in the present case the defendant and his co-perpetrators shot the victim fourteen times, and shot the two surviving victims five times each. Consequently, a comparison of the defendant's case with other similar cases indicates the death penalty would not be disproportionate considering the offender and the offense.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution, as provided by La. R.S. 15:567, until: (a) the defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United *654 States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
AFFIRMED.
CALOGERO, C.J., concurs and assigns reasons.
CALOGERO, C.J., concurring.
I concur in the majority's opinion for the following reasons:
I am not persuaded that Officer Zimmerman's testimony regarding gang drug activity was admissible, or not prejudicial, simply because no specific crimes were linked with the defendant or because of common knowledge presumably shared by jurors in this case that gang members engage in drugrelated and violent crimes. Our rule in State v. Jackson, 608 So.2d 949, 955 (La.1992) that the state produce clear and convincing evidence of the defendant's connection to other unadjudicated acts revealing his character and propensities for violent crime requires in the penalty phase of a capital case, as does the state's burden of proof beyond reasonable doubt in the guilt stage, more than "`mere speculation based upon guilt by association.' "State v. Schwander, 345 So.2d 1173, 1174 (La. 1977)(quoting State v. Williams, 310 So.2d 513, 515 (La. 1975)).
I am persuaded, however, that n this case the evidence did not interject an arbitrary factor into the sentencing hearing because it was admissible for a purpose other than suggesting the defendant's vague association with other uncharged crimes. The defendant's status in the Rolling 60's gang, together with what the terms "original gangster" meant within the gang, formed the core of the state's argument that because of his gang temperament and gang affiliations, the defendant posed a continuing threat not only to other persons in prison, but also to innocent civilians outside prison walls, such as the Henderson sisters. As explained by Zimmerman, the defendant traded on his capability to reach beyond his prison confinement in his graphic and threatening letters to Charlene Henderson. Overall, Zimmerman's portrayal of an incarcerated but scarcely subdued "original gangster" appeared consistent with other evidence of the defendant's conduct in prison, including his disciplinary write-ups and his fight with Sampson as if both men were still in the completely unsupervised environment of the streets. Jurors were entitled to consider the defendant's capacity for extreme violence, reflected in the grisly circumstances of the present crime, and his continuing capability for acting on his violent propensities within and without the prison walls through his gang affiliation, in determining the choice between capital punishment and a life term of imprisonment.
NOTES
[*] Lemmon, J., not on panel. Rule IV, Part 2, § 3.
[1] We will address those assignments of error which involve settled principles of law or which were not argued in brief or orally to this court in an unpublished appendix to this opinion.
[2] Bryant testified that as he was being led towards the kitchen he heard the men and Ford fighting and one of the men shouted, "shoot the bitch." He then saw Bratton and another man shoot Ford in the hallway leading from the kitchen to the bathroom and the two bedrooms. Bryant testified he heard no gunshots from the back room where he had last seen defendant until he saw Ford being shot. After Ford was shot, defendant came towards the front of the house to watch as two of the men attempted to kick the padlocked door down.

Ford testified the defendant put a gun to his head, took him into the kitchen, and asked where a certain room was. Ford led him to the padlocked door, and defendant began kicking at the door. Suddenly, defendant recognized Ford as "the bitch [who] tried to check [him] about his nephew coat" and ordered the men standing nearby to "shoot that bitch ass nigger." Shortly before he was shot, while the defendant was still standing in front of him, Ford heard gunshots coming from the back of the house where Frazier was.
[3] The letter stated in part as follows:

When they went to jack these niggers, me and the homeys, we got in the house and we made them lay down.... Slap got trigger happy and shot them anyway. Niggers didn't know methey know me and Alvin Elo, Little Nut. What I had come out the room looking for dope, that's when I heard the shooting. The niggers was still alive, so I knew that they know me, so I started to shoot, too ... We left them for dead. We did not look for them to make it but two of them did. I didn't go in to kill nobody, but I was put in that position to shoot them niggers through my home boy Slap put me in that damn position ... My homey's supposed to be killing these two niggers that lived. They want to come to court on me and the other homeys that lock up with me. They ain't did [st] to them niggers. The niggers is coming to court on us now. The homey Slap got us in this [st]. Now he don't want to do [st] about getting us out of this [st]. They got to kill them niggers. If they don't them niggers can come tell what the white folks that we shot them.
[4] Although this court has never ruled that defense counsel has the burden of requesting a Prieur hearing, defense counsel's failure to request a determination of the evidence's admissibility before the commencement of trial undermines his assertion that he contemporaneously objected to its introduction.
[5] Defense counsel had read passages from the Bible during closing arguments.
[6] Bernard, 608 So.2d at 970, notes that victim impact evidence may include personal qualities of the victim, and these may also include "degrading evidence" about the victim to show "lack of worth." La.C.Cr.P. art. 905.2. However, such "lack of worth" evidence should only be admitted in response to evidence by the state of a victim's worth. The prosecution did not introduce evidence of Jackie Sampson's worth.
[7] Defendant also argues he was denied his right to present a defense when the trial court excluded evidence of Sampson's prior violent acts. However, those cases cited by defendant in support of his argument refer to a defendant's right to present a defense when faced with a criminal charge. See State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, 201; State v. Gremillion, 542 So.2d 1074, 1078 (La.1989); State v. Vigee, 518 So.2d 501, 503 (La.1988); State v. Shoemaker, 500 So.2d 385, 389 (La.1987); State v. Vaughn, 431 So.2d 358 (La.1982) (on rehearing). Defendant here was not confronted with a criminal charge, and although the stakes arguably were even higher, as he was defending his life, the rationale of the cases cited is inapplicable in the instant context. Moreover, the evidence most likely would not have achieved the desired result as it would have left the jury with the impression that defendant was seeking revenge.

Defendant also argues the prosecutor opened the door to the evidence in question when he asked Deputy York if he knew of any fights between defendant and Sampson before the stabbing. Defendant asserts this questioning left jurors with the incorrect impression that defendant attacked Sampson although the two had no prior contact. However, testimony regarding defendant and Sampson's previous altercation most likely would have allowed the jury to draw negative inferences as opposed to positive ones.
[8] He began with the "origin of L.A. style street gangs" which he proposed began as gangs of migrant Mexican farm workers. "[B]lack gangs picked it up" from Mexican gangs and created gang names based on streets within their territories, including the Rollin' 60's and the 19's. Los Angeles gang members, fearing "prosecution" and "death," began branching out across the United States into "virgin territory" including Shreveport. Upon arriving in "virgin territory," gang members would call their contacts in Los Angeles and ask for shipments of cocaine which they would then sell at lower prices in Shreveport. Original Gangsters would recruit "wannabes" to help with drug trafficking. To be admitted to the gang, "wannabes" would have to commit violent acts. "The biggest [violent act required] in L.A. was [sic] take out a cop. The biggest thing here in Shreveport was to take out an individual." The "wannabes" are the most dangerous members of gangs because they will do any crime to ingratiate themselves with the gang leaders. Leaders of gangs change regularly and are "the biggest [and] the baddest." To become a leader, a gang member must complete a "show of force" which can include committing a crime, a murder, or a carjacking, and must brag about it or have witnesses nearby. Committing crimes in front of other gang members is a "natural high" that proves how "bad" a leading gang member is and confers power.

Within the city of Shreveport there are 24 different gang sets. Each gang has a delineated "turf." A handful of gang members from Los Angeles came to Shreveport in 1978 to "hide out;" however, organization of gangs only began in the mid 80's. The Rollin' 60's is a "set" that came from Los Angeles to Shreveport and has expanded into Homer and Summerfield. The Rollin' 60's are also Crips, as opposed to Bloods, two gang designations which originated in Los Angeles.
"Every gang is extremely violent." Gang members recruit children as young as eight years old to be "mule[s]" who carry guns and drugs for older members because the children cannot be prosecuted as adults. However, individuals typically join gangs at the age of twelve, thirteen, or fourteen because "[t]hey[are] looking for somebody to love." By the age of 23, most gang members are dead or in prison. Any gang member over the age of 30 "would definitely be the O.G .... the bad boy on the block."
[9] Zimmerman explained that when defendant wrote "[m]e and the homeys kicked a riot off with them slobs," he meant that he started a riot with the Bloods as "slob" is a "disrespect[ful term]" for Bloods. Defendant wrote that the "slobs were f____d up pretty bad" and that he "stole on [one of the slob's] eye" meaning he knocked the victim's eye out, according to Zimmerman. When defendant referred to "white folks and hoes" he meant the guards who had moved him into a different cell for fighting and had charged him with assault. Defendant was forced to share a cell with a "sooner ass nigga," meaning a member of the Shreveport Hoover Crip gang from Cooper Road. Defendant wrote that the "sooner ass nigga scared. He got every reason to be cause I'm going to get him. The bitch ass nigga know it too ... Soon as I catch him slipping with his head turned, I'm going to sneak his ass ... I'm fit to start acting like a real fool up here. Now I got a lot of pressure on my mind." Zimmerman explained that defendant intended to "fight [the Hoover gang member], stick him, whatever they do in prison," and that defendant was "fixing to lose it ... to come unglued." The prosecutor asked Zimmerman to skip ahead to defendant's signature line which read, "To me I got to roll on out now. Later, my home girl. Stay up. Mad Monster M.C., Rollin' 60's Crip."
[10] In the first letter he tells Charlene she is "just like that lying [a__], no good behind your back, [f______g a__] bitch sister of yours. But I've got plans for every mother[f______g] body who disrespects me." Respect is "everything in a gang," Zimmerman explained, and can only be earned by "committing a violent crime showing you're the biggest and the baddest with witnesses there, so they can testify how big and bad you are." Zimmerman continued reading the letter in which defendant expresses his anger at learning that Tina Henderson turned him in to police and threatens, "[t]ell the bitch she better start hiding again because the Monsta M.C. is real short on time.... But I don't get mad, I just get even.... I know that bitch [Tina] can't go two days without some [d__k] up in her [a__] so why lie to me about what's going on when I burn the hairs off her [p____y] with a cigarette lighter. Maybe then she'll let her [a__] [p____y] cool off from the [d__k] she's getting."

In the next letter, defendant refers to either Tina or Charlene as a "freaky bitch," which Zimmerman describes as a "very disrespectful term." The prosecution then asked, "[i]f a gang member, particularly the O.G. gets disrespected in his home turf, what normally happens at that point," and Zimmerman answered, "[w]e begin working a homicide." Defendant continuously threatened Tina for turning him in to police, saying, "I got a plan for your stinky [a] bitch. The next time you go in the hood, some of the homeys who didn't see you told me they waiting to catch your bitch [a] in the hood." Zimmerman explained that these "homeys ... plan[ned] to whoop [Tina's] [a]." The prosecutor then asked,
Officer Zimmerman, if an O.G. particularly wrote this type of information in a letter threatening someone, would you as a gang expert take that lightly?
A. It's a contract.
Q. Would you think it's a joke?
A. No.
Q. Would you think it's just macho talk?
A. No.
Q. Would you take it very seriously?
A. Very seriously.
Zimmerman continued reading defendant's letter in which he states, "a trick for a[d__k].... [B]rother told me you ain't [s__t] too. He said you got drunk and you was ready to [f__k]. That's just like a slut. I can't wait till I get out so I can kick you right in your stinky [a__] [p____y]. You done shamed me for the last time, bitch. I want you to know your day is coming sooner that you think it is." Zimmerman was concerned by defendant's threats, and noted that "[i]f [he] was handed this letter and told to do something about it, [he] would take this individual into protective custody, whoever he was threatening." Zimmerman read a final letter in which defendant again vaguely threatened Tina for turning him in to police.
[11] State v. Tyler, 175,282 First Judicial District, 97-0338 (currently on appeal); State v. Edwards, 177,994 First Judicial District, 97-1797 (appeal pending); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359, reh'g. denied, 513 U.S. 1066, 115 S.Ct. 687, 130 L.Ed.2d 617; State v. Code, 627 So.2d 1373 (La.1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491, reh'g. denied, 512 U.S. 1248, 114 S.Ct. 2775, 129 L.Ed.2d 887; State v. Felde, 422 So.2d 370 (La. 1982); State v. Ford, 489 So.2d 1250 (La.1985), cert. denied, judgment vacated, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987) (case remanded to trial court for hearing under Batson v. Ky., 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69). Only State v. Davis, supra, State v. Ford, supra, and State v. Tyler, supra, involved armed robbery murders similar to the present offense.